**CASE No. 20-2262**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

**DALE HARTKEMEYER (AKA SEIGEN) AND FATHER MARK O'KEEFE,**

*Plaintiffs-Appellants*

v.

**WILLIAM BARR, *ET AL.*,**

*Defendants-Appellees*

---

**EXECUTIONS SCHEDULED FOR JULY 15, 2020 AND JULY 17, 2020**

---

**MOTION TO STAY EXECUTIONS PENDING APPEAL**

---

Abigail A. Clapp
Greenberg Traurig, LLP
77 W. Wacker Dr., Ste. 3100
Chicago, IL 60601
Tel: (312) 508-4600
Fax (312) 899-0393
ClappA@gtlaw.com

Edward C. Wallace
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 801-9200
WallaceE@gtlaw.com

Michael M. Krauss
Greenberg Traurig, LLP
90 South Seventh Street, Suite 3500
Minneapolis, MN 55402
Tel: (612) 259-9700

David C. Fathi*
Daniel Mach
Heather L. Weaver
Jennifer Wedekind
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 548-6603
dfathi@aclu.org
dmach@aclu.org
hweaver@aclu.org
jwedekind@aclu.org

Cassandra Stubbs
Amy Fly
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
201 W. Main St., Suite 402
Durham, NC 27701

KraussM@gtlaw.com

Kyle R. Freeny*
Greenberg Traurig, LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
Tel:  (202) 331-3100
FreenyK@gtlaw.com


*Counsel for Petitioner-Appellant Father
Mark O'Keefe*

(919) 688-4605
cstubbs@aclu.org
afly@aclu.org

Douglas Hallward-Driemeier
Maria G. Calvet
Michelle H. Behrens
John T. Dey
ROPES & GRAY LLP
2099 Pennsylvania Avenue NW
Washington D.C. 20006
Tel:  (202) 508-4600
Douglas.Hallward-
    Driemeier@ropesgray.com
Maria.Calvet@ropesgray.com
Michelle.Behrens@ropesgray.com
John.Dey@ropesgray.com

*Not admitted in D.C.; practice limited to
federal courts


*Counsel for Petitioner-Appellant Dale
Hartkemeyer (aka Seigen)*

## INTRODUCTION

After a nearly two-decade hiatus and years of its own delay, the Government now substantially burdens the fundamental religious exercise rights of two priests, Reverend Hartkemeyer and Father O'Keefe, each duty-bound to perform sacred end-of-life rituals to individuals under their longtime pastoral care. It justifies its actions on a belatedly-asserted interest in finality in an inexplicable rush to proceed with three back-to-back executions during an ongoing pandemic and nationwide surge of COVID-19. As it presses forward with an ill-considered *post hoc* safety plan, contrary to its own policies, the Government pays virtually no regard for the life-threatening conditions doing so would inflict on Plaintiffs who shoulder a religious obligation to attend these executions in a cramped, poorly ventilated facility while confirmed COVID-19 cases within the larger prison complex go unchecked.

Shortly after the Attorney General's announcement of the warrants on June 15, 2020, Wesley Purkey's counsel sought clarity around the Government's purported safety measures; it admitted it had nothing in writing yet. Decl. of Rebecca Woodman, ECF 6-6, ¶ 5 That feeble response remains only minimally improved. The Government offered to conduct temperature checks and provide witnesses access to some personal protective equipment, soap, and hand sanitizer. Rick Winter Decl. , ECF 33-1 at p. 2, 78, p. 3, ¶8; Supp. RickWinter Decl., ECF 77-1 at p. 2, ¶1. When possible, the Government intends to allowsocial distancing but outlined no strategy to ensure it for attendees in the cramped, small observation rooms of the execution facility. It refused to conduct staff or prisoner testing and failed to disclose the points of origin for the 300 plus government personal descending on Terre Haute. Further, it offered no improvements to the admittedly poor ventilation system based solely on an excuse that its self-imposed time constraints do not afford the Government adequate opportunity to remedy this known hazard. Government's Response to Court's Order, ECF 81 at 3 ("BOP cannot overhaul

its ventilation system at this late date"). The Defendants' provisions are wholly inadequate measures that impose a substantial risk of serious illness or death to Rev. Hartkemeyer and Fr. O'Keefe. Dr. Fefferman Decl., ECF 58, ¶ 19; Dr. Goldenson Decl., ECF 57, ¶ 20. Defendants offer only counsel's own conclusory arguments to attempt to rebut these medical conclusions and their impact on the spiritual advisors' rights.

This troubling factual record of unmitigated risk to Plaintiffs became even more alarming after Defendants disclosed that a BOP staff member involved in execution preparations had been in close contact with numerous others while not wearing a mask for days before he tested positive for COVID-19. Winter Decl., ECF 77-1, ¶¶ 4-7. Subsequently, the District Court directed the Government to address how it intended to minimize the risk of COVID-19 transmission to the spiritual advisors in light of this late-breaking disclosure of a confirmed infection and exposures at USC Terre Haute and the breakdown in its stated mandatory mask policy. Order Setting Deadline to File Surreply, ECF 79 at 2. Yet again, the Government fell woefully short of its burden, making not a single modification to its questionable protocol and offering no expert opinion upon which the Government relied to assess its adequacy as the Court required. *See generally,* Government's Response to Court's Order, ECF 81. Even their belated reliance on the World Health Organization's controversial analysis of aerosol transmission does not attempt to rebut the problem of poor ventilation in the execution facility nor can it "rule out the possibility of short-range aerosol transmission." Response to Court's Order, ECF 81 at 4. Rather, their response, that "BOP cannot overhaul its ventilation system at this late date," substantiates the need for the injunctive relief. *Id*. at 3

In the face of this conclusive factual record, the District Court erred in denying injunctive relief and concluding that the Government did not impermissibly burden the spiritual advisors'

religious freedom rights by forcing a wrenching choice of exercising those rights against the backdrop of a pandemic with only its newfound interest in finality as justification, a rationale undercut by its own delays and mitigated by a reasonable postponement until proceeding does not also risk the lives of spiritual advisors specifically designated and religiously bound to be present. The Government cannot trample on Rev. Hartkemeyer and Fr. O'Keefe's exercise of a religious duty to be present at the executions of Mr. Purkey and Mr. Honken, respectively, particularly when it cannot articulate a compelling interest for doing so at this time. Therefore, the District Court's order should be reversed.

## STATEMENT

### A. Factual Background

1. *As Mr. Purkey's Longtime Priest and Designated Spiritual Advisor, Rev. Hartkemeyer Must Fulfill His Sacred Religious Duties at Mr. Purkey's Execution.*

Rev. Hartkemeyer is a Zen Buddhist priest. [Hartkemeyer Decl., ECF 6-2 at 2.] Ordained in 1983, he feels a religious calling to minister to prisoners, who are "too often denied Buddha's immense compassion." *Id.* at 3. Rev. Hartkemeyer entered into a pastoral relationship with Mr. Purkey in January 2009 and has since visited with Mr. Purkey once a month to provide spiritual guidance and counseling consistent with the Zen Buddhist faith. *Id*. at 4.

In 2013, Mr. Purkey designated Rev. Hartkemeyer as his official Minister of Record with the BOP. *Id.* And, in November 2019, pursuant to federal regulations, Mr. Purkey, designated Rev. Hartkemeyer as the spiritual advisor who "shall be present" at his execution, which was previously scheduled for December 13, 2019, at USP Terre Haute. Hartkemeyer Memorandum In Support of Preliminary Injunction, ECF 7 at 21. It is uncontroverted that Rev. Hartkemeyer planned to attend the December 2019 execution, consistent with his sincere religious belief that he has a sacred duty as Mr. Purkey's priest to help ensure Mr. Purkey's spiritual "liberation from

the limitations and sufferings inherent in our conditions as separate human beings" as he leaves this life. Hartkemeyer Decl., ECF 6-2 at 5. However, since learning that Mr. Purkey's execution has been rescheduled to take place during the pandemic, Rev. Hartkemeyer has felt substantial pressure to abandon his religious obligations as Mr. Purkey's priest due to the grave risk to his health and life as a result of the Government's decision to proceed during a pandemic. *Id.* at 8.

As Mr. Purkey's priest, Rev. Hartkemeyer intends to deliver a sutra, or a chant with content and meaning, and a dharani, a mantra-like chant, during the execution to facilitate Mr. Purkey's dying process and convey equanimity to him. *Id.* at 5-6. The religious rituals that Rev. Hartkemeyer intends to perform are akin to the "last rites" performed by priests in Christian tradition. *Id.* at 5. It is important that Mr. Purkey be able to see Rev. Hartkemeyer's face during this process, to remind him of the many hours the two spent together and the teachings Rev. Hartkemeyer shared during that time. *Id.* Rev. Hartkemeyer believes that his inability to perform his sacred pastoral duties would "constitute a troubling violation of [his] religious tenets and priestly obligations." *Id.* at 6.

2. *As Roman Catholic Priest, Father O'Keefe Is Religiously Obligated to Administer the Sacraments to Dustin Honken and Perform Last Rites at His Execution.*

Father Mark O'Keefe is a Roman Catholic priest, Order of St. Benedict. Before the COVID-19 pandemic, Father O'Keefe routinely ministered, as a BOP-accredited volunteer, to prisoners at Terre Haute USP, including to Mr. Honken. Fr. O'Keefe Decl., ECF 60-1, ¶ 1. Mr. Honken, a devout and pious Catholic for more than ten years, is scheduled for execution on July 17, 2020. *Id.* ¶ 1.

On June 30, 2020, Mr. Honken designated Father O'Keefe as the spiritual advisor to attend his execution, and requested that Father O'Keefe accompany Mr. Honken in the execution

4

chamber. *Id.* ¶ 2. On or about July 5, 2020, the BOP approved this request. (BOP Letter to Honken 60-2, ¶13.

Catholicism requires Father O'Keefe's presence at Mr. Honken's execution to allow him to administer the holy sacraments prescribed by the Catholic Church for the dying, including the Last Rites, which can be performed only by an ordained Catholic priest. . Fr. O'Keefe Decl.. ECF 60-1, ¶¶ 2, 6.) The Catholic Church teaches that the final moments offer a unique final chance for a priest to prepare the dying for "our heavenly homeland" and for pardon and redemption, as the moment of death "decides [man's] ultimate destiny." *Catechism of the Catholic Church* §§ 1013, 1525; *see also id.* §§ 1501-02, 1524. The guidance and accompaniment of a priest, and the Last Rites and the sacraments of the Eucharist and Confession which Fr. O'Keefe must administer to Mr. Honken help the dying avail themselves of the redemption offered by Jesus for eternal life with God. Fr. O'Keefe Decl. ECF 60-1, ¶¶ 9-13, 20. *See also* Liturgy Training Publications, *The Liturgy Documents Volume Two: Essential Documents for Parish Sacramental Rites and Other Liturgies* 228 (2nd ed. 2012) ("The presence of a priest or deacon shows more clearly that the Christian dies in communion with the church," and is "intended to help the dying person, if still conscious, to face the natural human anxiety about death by imitating Christ in his patient suffering and dying.").[1]

Based on his ministry to Mr. Honken, consistent with Catholic teachings, and in honor of his religious duty as a Catholic priest, Father O'Keefe feels spiritually and morally bound to to administer the sacraments and minister to Mr. Honken as he is put to death. Fr. O'Keefe Decl.,

---

[1] *See also Pope encourages group working to end use of death penalty*, Cath. News Agency (Feb. 27, 2019), https://www.catholicnewsagency.com/news/pope-encourages-group-working-to-end-use-of-death-penalty-89197 (Pope stating that, in executions, "there should at the very least be clergy available to hear a person's confession and offer reconciliation, even up to the moment of death.").

ECF 60-1, ¶¶ 2, 7-13, 20. Consistent with Catholic teachings and his duty as a priest to perform the Last Rites, Father O'Keefe holds a sincere belief that he must assist Mr. Honken in availing himself of the redemption that the death of Jesus offers. *Id.* ¶¶ 2, 7-13. Father O'Keefe wholly subscribes to the Catholic teachings that he is called upon to minister to those seeking God's grace, particularly at the critical moment of death; doing so is one of the most important roles that a priest can possibly play in helping a member of the flock achieve salvation. *Id.* ¶¶ 7-13, 20. . *Id.* ¶¶ 7-13, 20.) Fr. O'Keefe's sincerely-held religious beliefs compel him to accede to Mr. Honken's request to be present at his execution, to administer the sacraments necessary for salvation, and to prepare Mr. Honken to enter the next life in a state of God's grace. *Id.* ¶¶ 7-13, 20.

The scheduling of Mr. Honken's execution during the ongoing COVID-19 pandemic means that Father O'Keefe can exercise his sincerely-held religious beliefs and practices only by putting himself, and those he ministers to outside the prison, at grave risk. *Id.* ¶¶ 3-4, 14-20, 22.) At age 64, Father O'Keefe is at heightened risk of serious complications should he contract COVID-19*Id.* ¶ 14. Exposure resulting from his attendance at the execution also imperils Father O'Keefe's ministry to the nuns who are cloistered at the Carmelite Monastery in Terre Haute. *Id.* ¶ 19. As the Resident Chaplain for the nuns and as an essential part of his own religious practice, Father O'Keefe leads daily Mass for the nuns and offers them Communion. *Id.* Several of the nuns are over the age of 60, and a few are over 80. *Id.* Father O'Keefe understands that his presence at Mr. Honken's execution will expose him to COVID-19 infection and even death. *Id.* ¶ 20. He and the cloistered nuns to whom he ministers also understand, that if he continues to hold daily Mass for the nuns following Mr. Honken's execution, as they have requested and as he feels obligated to do, he may also expose them to infection and even death. *Id.* Father

O'Keefe risks life and limb notwithstanding the fears for his health and own life, and the health and lives of others to whom he ministers, because of his sincerely held belief that he must honor his sacred duty to minister to Mr. Honken at his execution. *Id.* As a consequence of the timing of Mr. Honken's execution in the midst of the pandemic, Father O'Keefe must take life-threatening risks in order to carry out his sacred duties as a Catholic priest and as Mr. Honken's spiritual advisor. *Id.*

3. *Clergy Presence at Executions Has Occupied a Hallowed Role Throughout American History.*

The Government jeopardizes a revered tradition in the United States of clergy presence in the last moments before and at the time of death of condemned prisoners. *See, e.g.,* Historical Newspaper Articles, ECF. 60-3 at 1-3; *see also* Stuart Banner, *The Death Penalty: An American History* 1 (2002) (recounting execution where the condemned asked a clergyman to read his final words for him).. This tradition derives, at least in part, from the Christian belief that a person's dying moments are critical to salvation and that, just as Jesus Christ ministered to the men being crucified alongside him, s*ee Luke* 23:42-43, clergy must help the condemned to seek salvation. *See*, *e.g.*, Ralph Houlbrooke, *Death, Religion, and the Family in England, 1480-1750* 147–49 (1998) ("The last moments of life were believed to be crucially important during the later Middle Ages. . . . [A]t this critical juncture, the Church offered help generally regarded as indispensable in making a safe departure from the world . . . ."). At the nation's founding, a clergyman's "execution sermon" from the scaffold went hand-in-hand with "the formulaic lives, last words, and dying confessions of the prisoner[.]" Louis P. Masur, *Rites of Execution: Capital Punishment and the Transformation of American Culture 1776-1865* 26 (1989). This clerical

role "was so routine that in 1791 William Smith could publish a guide-book for ministers [that contained] suitable devotions before, and at the time of Execution." *Id.* at 18.[2]

Federal executions have long recognized the hallowed place of clergy and followed this tradition. The first known federal execution, the hanging of Thomas Bird in 1790,[3] incorporated "solemn religious exercises." *See Portland*, Cumberland Gazette, June 28, 1790 ECF. 60-3 at 1. As in other executions of the day, the condemned man's exercise of religion contemplated ministry from and ritual performed by clergy continued to the place and time of death. *See May 10*, Vergennes Gazette & Vt. & N.Y. Advertiser, May 29, 1800ECF 60-3 at 2) (reporting federal executions in which condemned prisoners were "attended to the place of execution" by clergymen, where they prayed and expressed contrition); *The Execution of Edward F. Douglass and Thomas Benson for the Murder of Ava A. Havens*, Bos. Herald, Jul. 28, 1851, at 1 (reporting federal executions in which clergymen accompanied and embraced condemned prisoners on the gallows, and then conveyed their final declarations of innocence). Clergy have traditionally played a revered role in all manner of federal executions.

The tradition of clergy accompaniment during federal executions has since been incorporated into firing squads, *see* R. Michael Wilson, *Legal Executions in the Western Territories, 1847-1911*, 173 (2010); the gas chamber, *see Arthur Brown Executed In Gas Chamber*, Streator Daily Times-Press, Feb. 24, 1965,ECF 60-3 at 3); and electrocutions, as when a rabbi accompanied Ethel and Julius Rosenberg to the electric chair in 1953, *see* Jack Woliston,

---

[2] Unsurprisingly, these American traditions were similar to English practices during the colonial era. *See, e.g.*, Randall McGowen, *The Body and Punishment in Eighteenth-Century England*, 59 J. Mod. Hist. 651, 651 (1987) ("The condemned . . . were accompanied by a clergyman who shadowed their last moments urging them to repent or consoling them with the offer of divine forgiveness.").

[3] *See* "Historical Federal Executions," United States Marshals Service, *available at* https://www.usmarshals.gov/history/executions.htm (last checked July 3, 2020).

*Rosenbergs go silently to electric chair*, UPI (June 20, 1953), https://www.upi.com/Archives/1953/06/20/Rosenbergs-go-silently-to-electric-chair/5084629411212/. [4]   Today, the role of clergy at execution is memorialized in BOP regulations that enable a prisoner to select a spiritual advisor as one of the few individuals who "shall be present at the execution."  28 C.F.R. § 26.4(c)(3)(i).

4. *The Executions Scheduled Without any Meaningful Safety Plan Will Create Grave Risk to the Spiritual Advisors*

On June 15, 2020, "with the COVID-19 pandemic well underway," the Department of Justice announced four back-to-back executions, including Mr. Purkey's on July 15, 2020 and Mr. Honken's on July 17, 2020, without any meaningful safety measures in place to combat the risks from this highly contagious and deadly respiratory disease spreading rampantly across the United States. *See Peterson et. al. v. Barr*, No. 2:20-cv-00350-JMS-DLP (July 10, 2020); ECF 6-25 at 3-4.  The Government made this reckless decision even though carrying out executions necessitates the "activation" of hundreds of individuals at the prison for several days in advance to coordinate and practice. Rick Winter Decl. ECF 6-30 ¶¶ 5, 8..]  It ignored the clearly established CDC guidance that social distancing is a "cornerstone of reducing transmission of respiratory diseases such as COVID-19."  [Dr. Goldenson Decl., ECF 6-25 ¶ 20.][5]  It disregarded the heightened risk of transmission in prisons where nine of the ten largest outbreaks in the country have occurred.  [Hartkemeyer Memorandum in Support of Preliminary Injunction, ECF

---

[4] *See also* Ari L. Goldman, *Rabbi Irving Koslowe, 80; Gave Rosenbergs Last Rites*, N.Y. Times, Dec. 8, 2000, at C15 (describing the same rabbi's attendance at 17 executions where "[h]e would go into the execution chamber, stand opposite as the inmate was strapped into the electric chair, and stay until the end").

[5] *See* Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, at 4 (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

74.][6] And, it did nothing to mitigate against the specific and unique risk posed by the poor ventilation system at USP Terre Haute that cannot adequately direct airflow outside and prevent recirculation. Dr. Goldenson Suppl. Decl., ECF 57 ¶ 12.] It forged ahead against BOP's own policy in effect since March 2020 that suspended all visitation at all facilities. Woodman Decl., ECF 6-6 ¶¶ 3-5, 11.; Rev. Hartkemeyer Decl, ECF 6-2 ¶10]. The Government disregarded the impact of COVID-19 cases at USP Terre Haute reported as of May 16, 2020—over a month before the Attorney General's announcement—and only a small fraction of prisoners and staff have been tested. Plaintiff's Reply, ECF 62 at 7-8; *see also* Winter Decl. ECF 33-1, ¶7a.] When a staff member involved in execution preparations confirmed a positive test result on July 11, 2020, the Government still did not change course even though the staff member had potentially exposed others at the prison complex—including those slated to attend the executions or in designated locations where the spiritual advisors must go. *See generally*, Winter Decl. ECF 77-1; Government's Response to Order, ECF 81. Finally, the Government has not required staff at USP Terre Haute to adhere to the very mandate to wear masks that the Government touts as one upon which it claims Rev. Hartkemeyer and Father O'Keefe should rely for their safety. Winter Decl., ECF 77-1 ¶7; Winter Decl. ECF No. 33-1 ¶7. Indeed, reports confirm that no one in the execution chamber with Mr. Lee's spiritual advisor, including Mr. Lee, a U.S. Marshall, and two BOP officials, were wearing masks when Mr. Lee was executed early this morning. [7]

5. *The BOP's Planned Safety Measures are Inadequate to Protect Rev. Hartkemeyer and Father O'Keefe.*

---

[6] *See* John E. Dannenberg, *Prisons as Incubators and Spreaders of Disease and Illness*, Prison Legal News (Aug. 15, 2007) (discussing that jails and prisons "have become breeding grounds for infectious epidemics, with severe consequences for both prisoners and the public alike"), *available at* https://www.prisonlegalnews.org/news/2007/aug/15/prisons-as-incubators-and-spreaders-of-disease-and-illness/; Timothy Williams & Rebecca Griesbach, *San Quentin Prison was Free of the Virus. One Decision Fueled an Outbreak.*, N.Y. Times (June 30, 2020), https://www.nytimes.com/2020/06/30/us/san-quentin-prison-coronavirus.html.

[7] See also Michael Balsamo, First federal execution in 17 years; another set Wednesday, AP News (July 14, 2020) https://apnews.com/638826b00bba1b389756126e4cfae97a

At ages 68 and 64, respectively, Rev. Hartkemeyer and Father O'Keefe are particularly vulnerable to serious illness or death from COVID-19, based on their ages alone. Dr. Goldenson Decl, ECF 6-25, ¶¶ 13-15 . In addition, Rev. Hartkemeyer has a history of lung-related conditions. The limited measures Defendants belatedly devised to address the risk posed to Rev. Hartkemeyer and Father O'Keefe are inadequate to protect them from the substantial risk. Dr. Goldenson Supp. Dec. EFC 57 ¶ 20; Dr. Feffererman Decl., ECF 58 ¶ 16. All told, they include the provision of personal protective equipment (PPE)—a surgical face mask, gloves, gown and face shield—access to a shared sink, soap, and individual hand sanitizer. *See* Winter Decl., ECF 33-1 at ¶12. The Defendants will also provide an N-95 mask to the security escort—but no one else—and will attempt to limit the number of people in contact with Rev. Hartkemeyer. *Id.* ¶¶ 11-12 . But the surgical masks to be provided to Rev. Hartkemeyer and Father O'Keefe will not eliminate the risk of possible infection because they do not protect the wearer; they are designed only to protect those around the wearer. Dr. Goldenson Supp. Decl., ECF 57 ¶ 13. Further, the security escort's use of an N-95 mask provides limited, if any, extra protection to Rev. Hartkemeyer and Fr. O'Keefe beyond a typical mask because N-95 masks, unlike surgical masks, are designed to protect only the wearer, not those around the wearer. *Id.* And defendants have demonstrated an inability to enforce compliance of their mask regulations. [ Winter Decl., ECF 77-1 ¶7; Plaintiff's Response to Notice and Surreply, ECF 82 at 4.] Indeed, the measures put in place by the defendants "are inadequate to protect an individual who is vulnerable to COVID-19," according to Plaintiff's uncontested expert testimony. Dr. Goldenson Supp. Decl., ECF 57 ¶ 20]. "Even with such measures in place, a vulnerable individual is still at risk of contracting COVID-19 and suffering serious illness as a result." *Id.*

Moreover, Rev. Hartkemeyer and Father O'Keefe will be forced to have repeated, close contacts in cramped quarters with BOP staff and others, both to visit Mr. Purkey and Mr. Honken and to be present during the execution. Floyd Decl. 6-24 ¶¶ 9-12; Hartkemeyer Decl., ECF 6-2 ¶¶ 19-25]. The risk of airborne transmission of COVID-10 is "especially acute in indoor or enclosed environments, particularly those that are crowded and have inadequate ventilation." Dr. Goldenson Supp. Decl., ECF 57 ¶ 7 (quoting Lidia Morawska & Donald K. Milton, *It is Time to Address Airborne Transmission of COVID-19*, Clinical Infectious Diseases, ciaa939, https://doi.org/10.1093/cid/ciaa939. )]. Prison facilities are such an environment. Dr Goldenson Decl., ECF 6-25 ¶ 22. Without adequate ventilation, the risk of COVID-19 transmission remains high, particularly in the small, windowless building where the executions will take place. Dr. Goldenson Suppl. Dec, ECF 57 ¶ 12. Defendants have taken no measures to ensure adequate social distancing and, more importantly, have refused to consider practical measures to improve the ventilation in the areas where Rev. Hartkemeyer and Father O'Keefe will be. *See* Response to Court's Order,ECF 81 at 3. Such measures include (1) ensuring sufficient and effective ventilation; (2) supplementing that ventilation with airborne infection controls; and (3) avoiding overcrowding. Dr. Goldenson Suppl. Dec, ECF. 57 ¶ 7.

In response to the late-breaking diagnosis of the BOP staff member, the Government proposes only two additional steps: (a) to identify individuals with whom the BOP staff member was in contact, and (b) to prevent those identified from having contact with "inmates scheduled for execution, ministers of record, witnesses of the execution, attorneys, or press." Response to Court's Order, ECF 81 at 5. But, these measures fail to mitigate against the as yet unmeasured spread of and exposure to COVID-19 at the prison complex nor does it reduce other points of exposure for the medically vulnerable spiritual advisors. Dr. Goldenson Decl., ECF 6-25 ¶ 59,

61;  Dr. Goldenson Supp. Decl., ECF 80-1 ¶11;.  Further, Defendants plan to use screening measures the BOP has not updated since March 13, 2020 such as seeking self-reported symptoms, conducting temperature checks, and taking the other basic steps are simply "insufficient to protect visitors from the risk of COVID-19" and cannot adequately screen for new, asymptomatic, or pre-symptomatic infections.  Dr. Goldenson Decl. 6-25 ¶44.  Indeed, they have already failed to do so.

### STANDARD OF REVIEW

Appellants seek a stay of the execution date pending appeal.  *See* Fed. R. App. P 8(a).  "Stays, like preliminary injunctions, are necessary to mitigate the damage that can be done during the interim period before a legal issue is finally resolved on its merits.  The goal is to minimize the costs of error."  *In re A & F Enterprises, Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014).  Therefore, "[t]he grant of a stay entails equitable as well as legal considerations."  *Lee v. Watson*, 2019 WL 6718924, at *2 (7th Cir. 2019).

"The standard for granting a stay pending appeal mirrors that for granting a preliminary injunction."  *In re A & F Enterprises, Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014).  This Court considers four factors:  "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Nken v. Holder,* 556 U.S. 418, 426 (2009).  "In reviewing a motion for a stay pending appeal, [this Court must] review the district court's findings of fact for clear error, its balancing of the factors under the abuse of discretion standard and its legal conclusions de novo."  *Hinrichs v. Bosma*, 440 F.3d 393, 396 (7th Cir. 2006).  This Court evaluates the factors above "us[ing] a sliding scale approach."  *Cavel v.*

*Intern, Inc. v. Madigan,* 500 F.3d 544, 547-48 (7th Cir. 2007). The greater the balance of harms, the less heavily the moving party's likelihood of success on the merits weighs in favor of a stay. *See In re A & F Enterprises,* 742 F.3d at 766.

## ARGUMENT

**I.  Plaintiffs Have Shown A Likelihood of Success On Their RFRA Claims.**

Rev. Hartkemeyer and Father O'Keefe are likely to succeed on their RFRA claims. To prevail under RFRA, each plaintiff must show that the Government's actions "substantially burden [his] exercise of religion." 42 U.S.C. § 2000bb-1. Once he has met this prong, "the burden shifts to the government to demonstrate that" its conduct satisfies RFRA's strict-scrutiny test. *See Adams v. Comm'r*, 170 F.3d 173, 176 (3d Cir. 1999). This test requires the Government to demonstrate that the application of the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.

The Government's plan to move forward with Mr. Purkey's and Mr. Honken's executions during a dangerous pandemic substantially burdens the religious exercise of Rev. Hartkemeyer and Father O'Keefe, respectively, by forcing each either to abandon his religious duty to attend the execution as the prisoner's designated spiritual advisor or face the risk of serious illness or death as a person especially susceptible to illness or death from COVID-19. There is no reason why the Government must proceed with the executions during a pandemic when the Government can carry out its interest through the obvious, less restrictive alternative of delaying the executions until Rev. Hartkemeyer and Father O'Keefe can safely attend.

### A. The Government's Actions Substantially Burden Rev. Hartkemeyer's And Father O'Keefe's Exercise Of Religion.

The District Court fundamentally erred in holding that the scheduling of an execution cannot amount to a substantial burden under RFRA because the BOP has "unconstrained discretion to choose a date for the execution." *See* Op., ECF No. 84 at 5 (quoting *Barr v. Lee*, 591 U.S. ---, ---, No. 20A8 (July 14, 2020) (per curiam). The amount of discretion vested in the government is irrelevant as a matter of law. By its terms, RFRA's reach extends to "all Federal law," even those statutes that otherwise give the government broad latitude. 42 U.S.C. 2000bb-3(a) ("This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise. . . "); *see also Bostock v. Clayton County*, 140 S. Ct. 1731, 1754 (2020) ("RFRA operates as a kind of super statute, displacing the normal operation of other federal laws"); *Rweyemamu v. Cote*, 520 F.3d 198, 202 (2d Cir. 2008) ("At bottom, the import of RFRA is that, whatever other statutes may (or may not) say, 'the Federal Government may not, as a *statutory matter*, substantially burden a person's exercise of religion.'") (emphasis in original) (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424, (2006)). The only question is whether the government's conduct substantially burdens a person's exercise of religion.

A substantial burden exists when the Government puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 141 (1987). Here, as the District Court recognized, Rev. Hartkemeyer's and Fr. O'Keefe's "sincerely held religious beliefs *require them* to attend the spiritual needs of Mr. Purkey and Mr. Honken, respectively, as these men face execution." Op. at 5 (emphasis added). The Government's conduct in setting the executions during a surging pandemic puts "substantial pressure" on the priests to modify or abandon entirely the performance of their

sacred duties—in particular, the sacrament of the Catholic Last Rites (and similar Buddhist rituals) at the moment of death. Because the Government insists on executing Mr. Purkey and Mr. Honken this week, the priests can carry out this vital and essential task only if they accept grave risk.

The District Court failed to address controlling precedent that forcing a person to choose between his religion and his well-being is a substantial burden on the exercise of religion. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963) ("The ruling [disqualifying plaintiff from benefits because of her refusal to work on Saturday in violation of her faith] forces her to choose. . . . Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against [her] for her Saturday worship."); *Thompson v. Holm*, 809 F.3d 376, 380 (7th Cir. 2016) ("We have repeatedly held that forcing an inmate to choose between daily nutrition and religious practice is a substantial burden"); *Nelson v. Miller*, 570 F.3d 868, 870 (7th Cir. 2009) (holding that a substantial burden exists where the government "forces [a prisoner] to choose between his religious practice and adequate nutrition"). There is no meaningful distinction between the priests here and the plaintiffs in these case. The Government did not order the Seventh-Day Adventist in *Sherbert* to work or not to work, or the prisoners in *Thompson*, *Nelson*, and *Hunafa* to eat or not to eat—in each instance, that "choice" rested with the individual. But, in each instance, a substantial burden existed because the Government undertook an action that forced the plaintiff to choose between the exercise of religion, on the one hand, and physical or economic well-being, on the other.

Rev. Hartkemeyer has been Mr. Purkey's priest for eleven years, and he believes he has a sacrosanct religious duty to be present at Mr. Purkey's execution, where he must perform religious rituals (akin to Last Rites) to help guide Mr. Purkey as he leaves this life. Hartkemeyer

Decl. ¶¶ 2-15, ECF No. 6-2 at 2-5. For Rev. Hartkemeyer, his failure to be present at Mr. Purkey's execution to carry out these Buddhist rituals would "constitute a troubling violation of [his] religious tenets and priestly obligations." *Id.* at ¶ 15.

As a Roman Catholic priest, Father O'Keefe is morally and spiritually obligated, in the most sacred of duties, to minister to Mr. Honken at the time of death by administering the sacrament of Last Rites. O'Keefe Decl. ¶¶ 2-4, 12-14, 20, ECF No. 42-2 at 2, 4, 6. The Catholic Church teaches, and Father O'Keefe sincerely believes, that administering Last Rites is one of the most vital roles that a priest performs and is essential to salvation. *Id.* ¶¶ 7-13, 20. The Government imposes this burden on Father O'Keefe if he is to meet his religious obligations.[8]

By forcing each priest to assume the risk of contracting and spreading COVID-19 to honor his sacred duties, the Government has imposed a substantial burden on his exercise of religion. *See, e.g.*, *Korte v. Sebelius*, 735 F.3d 654, 682–83 (7th Cir. 2013) ("[A] law, regulation, or other governmental command substantially burdens religious exercise if it bears direct, primary, and fundamental responsibility for rendering a religious exercise effectively impracticable.") (internal quotation marks omitted); *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008) (holding that prison officials' clergy-verification requirement rendered prisoner's religious exercise "effectively impracticable" and constituted a substantial burden because it "'put[s] substantial pressure on an adherent to modify his behavior and violate his beliefs.'") (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981)).

Neither *Lyng* nor *Bowen*, relied on by Defendants in the District Court and cited in the District Court's opinion, (ECF No. 33 at 11-13; ECF No. 84 at 4), requires this Court to hold

---

[8] Father O'Keefe also is morally and spiritually obligated, as "an essential part of [his] ministry," to administer Communion to elderly nuns at the Carmelite Monastery on a daily basis. (*Id.* ¶ 19.) Because the Government insists on executing Mr. Honken this week, Father O'Keefe must bear the burden not just of contracting COVID-19 himself, but spreading it to "those closest to [him] in the faith." (*Id.* ¶ 20.)

otherwise. In *Lyng,* the government sought merely to make use of its own land; the plaintiffs, who had no ownership interest in the land and, in fact, no legal right to be present on the land, had no protected interest to assert. *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 453 (1988). In *Bowen*, the government used a Social Security Number in its internal administration of benefits; the plaintiff had no right or obligation to be a part of that internal process. *Bowen v. Roy*, 476 U.S. 693, 699–700 (1986).

Here, by contrast, setting an execution in the midst of a pandemic is more than just a matter of ordering the Government's "internal affairs," like the "size or color of the Government's filing cabinets." *Roy*, 476 U.S. at 700. "[T]he execution of a human being by the state is perhaps the most solemn and significant act a government can perform. It should not be reduced to an invisible, bureaucratic function." *United States v. Sampson*, 300 F. Supp. 2d 278, 280 (D. Mass. 2004), *aff'd*, 486 F.3d 13 (1st Cir. 2007). Just as important, neither Rev. Hartkemeyer nor Father O'Keefe can be labeled an "incidental" bystander to the execution. As the priests with a sacred duty to minister to the condemned prisoners, each clergy fills a critical role that has been recognized throughout our Nation's history, and is memorialized by Defendants' own regulations. *See supra* p. 9; 28 C.F.R. §§ 26.4(b), 26.4(c)(3).[9]

By forcing each priest either to perform his duties under the serious threat of COVID-19, or forgo them altogether, Defendants' conduct directly affects and regulates each priest, imposing a substantial burden on his religious exercise. The safety protocols proposed by Defendants are simply insufficient to alleviate that burden. The health and lives of Rev.

---

[9] In fact, it is precisely because Defendants exercise total control over Mr. Purkey and Mr. Honken, including the environment for executions, that they have a special obligation to facilitate the spiritual relationship between them and their spiritual advisors. *See*, *e.g.*, *Katcoff v. Marsh*, 755 F.2d 223, 235 n.4 (2d Cir. 1985) (explaining that the "provision by state and federal governments for chaplains in penal institutions" is a necessity "[s]ince government has deprived such persons of the opportunity to practice their faith at places of their choice").

Hartkemeyer, Father O'Keefe, and those close to them will still be at grave risk if each Plaintiff attends the respective executions.

### B. The Government Has Not Demonstrated A Compelling Interest For Its Actions.

The Government must demonstrate that its decision to schedule the executions during a pandemic—notwithstanding the extraordinary danger it poses to Rev. Hartkemeyer, Father O'Keefe, and everyone involved—is in "furtherance of a compelling governmental interest." *See* 42 U.S.C. § 2000bb-1. Defendants' burden is heavy, and even prison officials are not entitled to "unquestioning deference" by courts applying this prong of RFRA. *See Holt v. Hobbs*, 574 U.S. 352, 364 (2015).[10] Rather, courts must "look[] beyond broadly formulated interests justifying the general applicability of government mandates" and "scrutinize[] the asserted harm" of denying the relief or alternative course of action proposed by the religious claimant. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006); *see also Burwell*, 573 U.S. at 726 (noting that the governmental interest cannot be "couched in very broad terms").

The Government cannot credibly argue that it has a compelling interest in moving forward with the executions immediately, when its own actions contradict that alleged interest. Where the Government has acted in a way that leaves "appreciable damage" to its alleged interest, RFRA's compelling-interest prong is not satisfied. *See O Centro*, 546 U.S. at 433 ("[A] law cannot be regarded as protecting an interest "of the highest order" . . . when it leaves appreciable damage to that supposedly vital interest unprohibited') (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993)). For years, the Government did not seek to effectuate the interests it now asserts. For example, Mr. Purkey was sentenced to

---

[10] Although *Holt* involved a RLUIPA claim, RFRA is RLUIPA's "sister statute," and both laws apply the same legal standard. *Holt,* 574 U.S. at 357-358.

death sixteen years ago, and his federal habeas review concluded in 2014. *Purkey v. United States*, 135 S.Ct. 355 (2014); *see also Purkey v. United States*, No. 19-3318, 2020 WL 3603779, at \*4 (7th Cir. July 2, 2020) ("For many years—to be exact, since March 18, 2003, when Louis Jones, Jr. was executed—the federal government has not carried out any executions. But policy changed in the current Administration, which is moving quickly to resume executions"). Mr. Honken's execution has been subject to similar delays of the Government's own making. Having delayed all these years in carrying out the death penalty, a further delay to accommodate the presence of clergy to perform essential ministry during the prisoners' hour of greatest need does not interfere with any compelling interest on the part of the Government. . Moreover, the Government's asserted interest in proceeding with the executions this weekis undermined by the fact that the plan runs counter to other governmental interests. The Government's supervisory role over the thousands of prisoners detained at USP Terre Haute prohibits them from showing deliberate indifference to the conditions of confinement of those individuals. *See, e.g., Banks v. Booth*, No. CV 20-849 (CKK), 2020 WL 3303006, at \*12 (D.D.C. June 18, 2020) (plaintiffs likely to succeed on constitutional deliberate indifference claims where Warden and Department of Corrections Director failed "to take comprehensive, timely, and proper steps to stem the spread of the virus"). Holding an execution that requires an enormous influx of people contravenes the BOP's bureau-wide policy of prohibiting visitation at prisons to reduce COVID-19 spread, including at the Terre Haute facility. The Government's choice to schedule an execution at this time also frustrates compliance with its own regulations, as FCC Terre Haute has not allowed in-person visitation for months, including from legal counsel. Woodman Decl. ¶¶ 3-5, ECF No. 6-6 at 2-4.

## C. The Government Is Not Using The Least Restrictive Means To Further Its Interests.

Where a less restrictive means "is available for the Government to achieve its goals, the Government *must* use it." *Burwell v. Hobby Lobby*, 573 U.S. 682, 728 (2014) (emphasis added). RFRA's least-restrictive-means requirement imposes a "heavy burden" on the Government, which "must provide actual evidence, not just conjecture, demonstrating that the . . . [official conduct] in question is, in fact, the least restrictive means." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 475–76 (5th Cir. 2014); *see also Holt*, 574 U.S. at 364-65 ("The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party.") (quoting *Burwell*, 573 U.S. at 728 (internal quotation marks omitted)). The Government must demonstrate that it has actually "considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008).

After evincing a gross disregard for the safety of all in attendance, Defendants argue that they cannot indefinitely suspend the Government's ability to execute Mr. Purkey and Mr. Honken, but that is not what Plaintiffs ask this Court to do: They request that the execution be delayed only until a vaccine or effective treatment is developed so that they may safely attend the executions and carry out their religious obligations without risking their health and lives. Though it is not clear exactly when this will occur, Dr. Anthony Fauci, the Government's leading expert on the pandemic, testified last month that a vaccine was a "matter of when and not if" and that one could be available by the end of this year.[11]

---

[11] *COVID-19 vaccine a matter of 'when not if,' but must be produced safely: Fauci*, CBC (Updated June 23, 2020) https://www.cbc.ca/news/world/dc-house-coronavirus-briefing-1.5623382. *See also, See Trump Administration's Operation Warp Speed Accelerates AstraZeneca COVID-19 Vaccine to be*

Moreover, even if the executions are not delayed until an effective treatment or vaccine is available, there exists still another less restrictive measure available to Defendants than proceeding as currently planned: Defendants could, for example, take additional steps to ensure Plaintiffs' safety by addressing the key risks in a much more robust way—in particular, making changes to the ventilation system, which would significantly decrease the risk of exposure and spread identified by Plaintiffs' expert, Dr. Goldensen. Goldenson Suppl. Decl. ¶ 12, ECF No. 57 at 3. Defendants do not deny this possibility; they just cannot make these changes on their current, inexplicably rushed timeline. ECF No. 81 at 3. But, where postponement of a government proceeding would avoid infringing a fundamental right, the Supreme Court has held that the government must provide evidence that any less restrictive alternative is not adequate. *See Nebraska Press Ass'n v. Stuar*t, 427 U.S. 539, 563–64 (1976) (holding that, before issuing a gag order on media publication of details relating to an upcoming high-profile trial, the Nebraska Supreme Court had improperly failed to demonstrate the inadequacy of specified less restrictive alternatives, including "postponement of the trial to allow public attention to subside"). The Government, with its general, unsupported assertions that they cannot delay these executions for any reason, has not met this heavy burden here. *See Askins v. U.S. Dep't of Homeland Sec*., 899 F.3d 1035, 1045 (9th Cir. 2018) ("It is the government's burden to prove that these specific restrictions are the least restrictive means available to further its compelling interest. They cannot do so through general assertions of national security, particularly where plaintiffs have alleged that CBP is restricting First Amendment activities in traditional public fora such as

---

*Available Beginning in October*, U.S. Dep't of Health and Human Servs. (May 21, 2020), https://www.hhs.gov/about/news/2020/05/21/trump-administration-accelerates-astrazeneca-covid-19-vaccine-to-be-available-beginning-in-october.html*; See also Fact Sheet: Explaining Operation Warp Speed*, U.S. Dep't of Health and Human Servs. (June 16, 2020), https://www.hhs.gov/about/news/2020/06/16/fact-sheet-explaining-operation-warp-speed.html.

streets and sidewalks."); *see also Burwell*, 573 U.S. at 728 ("HHS has not shown that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties in these cases").

Here, any interest the Government has in carrying out the executions can be effectuated in a less restrictive way—namely, postponing them  until a time at which it is not "effectively impracticable" for Rev. Hartkemeyer and Father O'Keefe to safely fulfill their sacred duties as spiritual advisors.  The Government's interest could be served at that later time, but in a way that does not violate RFRA by infringing on Rev. Hartkemeyer's and Fr. O'Keefe's religious exercise.

**II. The Balance Of The Equities Strongly Favors A Brief Stay Of The Executions To Permit Appellants A Meaningful Opportunity To Vindicate Their Religious Liberties.**

As noted above, the District Court's denial of Appellants' motion for preliminary injunction rested solely on its erroneous legal conclusion that Rev. Hertkemeyer and Father O'Keefe are unlikely to succeed on their RFRA claims.  The District Court entirely failed to weigh the additional balance of harms that govern equitable relief, to wit: (1) the irreparable harm without court intervention; (2) the "balance of equities"; and (3) the public interest, *see Hill v. McDonough*, 547 U.S. 573, 584 (2006).  *See* Op. Denying Mot. for PI at 6, ECF No. 84 ("Given the plaintiffs' slim chances of success, the Court need not address the other factors for granting an injunction.").  As an initial matter, the District Court erred in failing to apply a sliding scale in balancing the strength of Appellants' RFRA claims with the relevant equitable factors.  As this Court has consistently confirmed, "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Hoosier Energy v. John Hancock*, 582 F.3d 721, 725 (7th Cir. 2009).

The stakes here could not be more dramatic: on one side of the scale is the Government's interest in carrying out the executions on the precise timeline of its choosing, *i.e.*, on July 15, 2020, and July 17, 2020, having knowingly set those dates in the midst of the pandemic and without taking account of the serious risks that it would place on the spiritual advisors; and on the other, is the fundamental religious liberty of Appellants, whose respective faiths direct them to be present at the executions but whose RFRA claims will be mooted in the absence of equitable relief, and the very the health and lives of the physically vulnerable Appellants, those to whom they minister, and the public at large. When Appellants' motion is viewed in this light, as it must be, the balance of harms tips decidedly in favor of temporary injunctive relief to permit Appellants' RFRA claims to be fully adjudicated.

**A. Rev. Hartkemeyer And Father O'Keefe Will Suffer Irreparable Harm In The Absence of Relief, Including Permanent Loss of Their RFRA Claims.**

Rev. Hartkemeyer and Father O'Keefe will suffer irreparable injury if the executions are not enjoined pending an opportunity for a full and proper adjudication and appellate review of their RFRA claims. Put starkly, in the absence of such relief, Rev. Hartkemeyer and Father O'Keefe will necessarily be put to the very Hobson's choice that is the basis of their religious liberty claims, to wit, the choice between carrying out their sacred religious duties to guide their charges through the ordeal of execution or shouldering the very serious risks to life and limb associated with attending the executions this week. Temporary relief is imperative to prevent Appellants' religious liberty claims from being mooted by the action of the Government.

The loss of First Amendment rights "'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Korte v. Sebelius*, No. 12-3841, 2012 WL 6757353, at *4 (7th Cir. Dec. 28, 2012) (*quoting Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion)). After an eleven-year spiritual relationship, Rev. Hartkemeyer has only one opportunity to guide Mr.

Purkey to the afterlife. With each hour that the execution draws closer, he must continue to weigh the wrenching choice of whether to abandon his religious duties to Mr. Purkey or risk his own life by attending the execution under unsafe conditions to which he is especially susceptible. At age 64, Father O'Keefe is also at an increased risk for severe illness from COVID-19, as are several of the nuns to whom he ministers daily, including some over 80 years old. Without a stay, the only way Father O'Keefe could avoid this risk to himself and those close to him would be to shirk his solemn religious duties as a Catholic priest to administer the holy sacraments and perform Last Rites prescribed by the Catholic Church for the dying.

The risk of serious disability or death Appellants face by ministering at the executions is also quintessentially an irreparable harm. *See Nat'l Ass'n of Farmworkers Organizations v. Marshall*, 628 F.2d 604 (D.C. Cir. 1980) (finding irreparable harm from health risks associated with exposure to toxic chemicals, where no scientific consensus existed as to safe). The District Court overlooked the extensive record below, showing that the procedures that will be used for this week's executions, should they go forward as planned, expose Appellants to a gravely high risk of serious health complications or even death—including some risks of permanent disability and impairment that the health community is still evaluating. *See* Decl. of Dr. Nina Fefferman, ECF 58, ¶ 19; Decl. of Dr. Joe Goldenson, ECF 57, ¶ 20. Nevertheless, the Government has steadfastly refused to take any additional measure to reduce the risks to Appellants. *See, e.g.*, ECF 81 at 3 (noting that BOP would not consider modify its ventilation system because it could not accomplish it by its self-selected dates of execution).

> **B. The Government's Interest In Executing Mr. Purkey And Mr. Honken On Its Own Timeline Cannot Justify Foreclosing Appellants' Opportunity To Vindicate Their Religious Liberty Claims.**

In contrast to the weighty and irreparable constitutional and physical harms that will befall Rev. Hartkemeyer and Father O'Keefe in the absence of a brief stay of the executions

pending their appeal, Defendants cannot show significant injury from the postponement of the executions for whatever time is necessary to fully adjudicate that appeal. *See Purkey v. United States*, No. 19-3318, 2020 WL 3603779, at \*11 (7th Cir. July 2, 2020) ("A brief stay to permit the orderly conclusion of the proceedings in this court will not substantially harm the government, which has waited at least seven years to move forward on Purkey's case."). While rescheduling the execution will force the Government to make alternative logistical arrangements, this inconvenience does not amount to substantial injury, particularly given the Government "has waited at least seven years to move forward on Purkey's case." *Purkey v. United States*, No. 19-3318, 2020 WL 3603779, at \*11 (7th Cir. July 2, 2020). Indeed, the Government did not proceed with *any* federal executions during that time, including Mr. Honken's. "[T]hat the government has not—until now—sought to" schedule Mr. Purkey's and Mr. Honken's executions "undermines any urgency surrounding" its need to do so on July 15, 2020, and July 17, 2020, respectively. *Osorio-Martinez v. Att'y Gen. of the U.S.*, 893 F.3d 153, 179 (3d Cir. 2018).

Moreover, whatever the strength of the Government's late-arrived interest in finality may be, it cannot overcome the irreparable harms to Appellants, as discussed above. Just as this Court held when balancing religious liberty interests in *Korte*, while an injunction pending appeal may "temporarily interfere[] with the government's goal" of executing Mr. Purkey and Mr. Honken their own timeline, which was arbitrarily selected by the government, it is "is outweighed by the harm to the substantial religious-liberty interests on the other side." *See Korte*, No. 12-3841, 2012 WL 6757353 at \*6.

### C. The Public Interest Also Favors Temporary Injunctive Relief.

The public interest is overwhelming served by the temporary injunctive relief sought here. The execution is a potential super-spreader event that threatens the health of staff and witnesses

in attendance, the surrounding community, and individuals across the country in places where individuals will travel from and return to after attending the executions. *See* ECF No. 1 at 13; Vartkessian Suppl. Decl., ECF No. 80-3. On the contrary, the public interest is further served by temporary injunctive relief to prevent the premature mooting of the religious freedom claims of Rev. Hartkemeyer and Father O'Keefe. As the Seventh Circuit has routinely acknowledged, protecting religious freedoms is "always in the public interest." *Christian Legal Soc'y v.Walker,* 453 F.3d 853, 859 (7th Cir. 2006). Given the gravity of the interests involved, both in relation to religious freedom and public health, the public interest is served by staying Mr. Purkey's and Mr. Honken execution until the RFRA claims at issue in this appeal are resolved. *See Purkey v. United States*, 2020 WL 3603779, at *11 (C.A.7 (Ind.), 2020) (finding public interest served by granting stay of execution pending appeal and observing that "[j]ust because the death penalty is involved is no reason to take shortcuts—indeed, it is a reason not to do so.").

## <u>CONCLUSION</u>

For the reasons stated above, this Court should stay Mr. Purkey's and Mr. Honken's executions until the Court has had an opportunity to rule on Plaintiffs' appeal from the denial of a preliminary injunction.

Dated: July 14, 2020

|  |  |
|---|---|
|  | Respectfully submitted, |
|  |  |
|  | /s/ *Douglas Hallward-Driemeier* |
| Abigail A. Clapp | Douglas Hallward-Driemeier |
| Greenberg Traurig, LLP | Maria G. Calvet |
| 77 W. Wacker Dr., Ste. 3100 | Michelle H. Behrens |
| Chicago, IL 60601 | John T. Dey |
| Tel: (312) 508-4600 | ROPES & GRAY LLP |
| Fax (312) 899-0393 | 2099 Pennsylvania Avenue NW |
| ClappA@gtlaw.com | Washington D.C. 20006 |
|  | Tel: (202) 508-4600 |
| Edward C. Wallace | Douglas.Hallward- |
| Greenberg Traurig, LLP | Driemeier@ropesgray.com |

200 Park Avenue
New York, NY 10166
Tel: (212) 801-9200
WallaceE@gtlaw.com

Michael M. Krauss
Greenberg Traurig, LLP
90 South Seventh Street, Suite 3500
Minneapolis, MN 55402
Tel: (612) 259-9700
KraussM@gtlaw.com

Kyle R. Freeny*
Greenberg Traurig, LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
Tel: (202) 331-3100
FreenyK@gtlaw.com

*Counsel for Petitioner-Appellant Father
Mark O'Keefe*

Maria.Calvet@ropesgray.com
Michelle.Behrens@ropesgray.com
John.Dey@ropesgray.com

David C. Fathi*
Daniel Mach
Heather L. Weaver
Jennifer Wedekind
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 548-6603
dfathi@aclu.org
dmach@aclu.org
hweaver@aclu.org
jwedekind@aclu.org

Cassandra Stubbs
Amy Fly
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
201 W. Main St., Suite 402
Durham, NC 27701
(919) 688-4605
cstubbs@aclu.org
afly@aclu.org

*Not admitted in D.C.; practice limited to
federal courts

*Counsel for Petitioner-Appellant Dale
Hartkemeyer (aka Seigen)*

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 14, 2020, a true copy of the foregoing motion has been filed electronically using the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: July 14, 2020                    By:

/s/ *Douglas Hallward-Driemeier*
Douglas Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue NW
Washington D.C. 20006
Tel: (202) 508-4600
Douglas.Hallward-
Driemeier@ropesgray.com

*Counsel for Petitioner*
*Appellant Dale Hartkemeyer (aka*
*Seigen)*