# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

|  |  |  |
|---|---|---|
| DALE HARTKEMEYER (AKA SEIGEN) | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. _____ |
| | ) | |
| WILLIAM P. BARR, in his official capacity as the Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as the Director of the Federal Bureau of Prisons; and T.J. WATSON, in his official capacity as Complex Warden for Terre Haute Federal Correctional Complex, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

**DECLARATION OF DALE (SEIGEN) HARTKEMEYER**

I, Dale Hartkemeyer (aka Seigen), pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the Plaintiff in the above-captioned case.

2.      I am a Zen Buddhist priest. I began my practice of Zen Buddhism in 1978 while in Europe. I received lay precepts in 1981: In Buddhism, the ceremony called "Receiving the Precepts" serves as a layperson's first official declaration of his intent to become a Buddhist. During this ceremony, the layperson publicly acknowledges that he will live according to the sixteen precepts of Mahayana Buddhism, which are ethical guidelines for behavior similar to the Ten Commandments in the Judeo-Christian tradition.  After further studying the Zen Buddhist teachings and attending various religious retreats, I was then ordained as a monk in 1983 in France in the lineage of Zen

1

master Taisen Deshimaru. In connection with my ordination as a Buddhist priest, I took on the religious name of "Seigen," which means "Sacred Source."

3.      Since 2008, I have been associated with the Sanshin Zen Community under Reverend Shohaku Okumura in Bloomington, Indiana, participating in near-daily Zen practice at the temple as well as in retreats and sesshin (intensive silent retreats), and assisting Rev. Okumura with translations into English of Japanese Soto Zen teachings. All of these activities have come to a halt during the COVID-19 pandemic, with the exception of assisting with translations which I am working on remotely from home.

4.      In addition to my regular Zen practice, as a Buddhist priest, I have helped organize and direct retreats at the Sanshin Zen Community, participated in committee meetings, and delivered Dharma talks, which are the equivalent of a sermon in other faith traditions. I also have been religiously called to provide spiritual counseling to prisoners. The Mahayana Buddhist precepts, which we take as lay or ordained Zen Buddhists, teach us that a bodhisattva (one following the Buddha who aspires to help liberate all suffering beings) needs to visit a person who is in distress or trouble (sick, injured, etc.) and provide that person whatever help, relief, or consolation he can. These precepts are based on the core Buddhist commitment to compassion. I believe wholeheartedly in this religious mandate and, as a Buddhist priest, I believe that I have a religious obligation to show compassion for incarcerated individuals, in particular. They are too often denied Buddha's immense compassion, his great wish for the well-being of all his children, who include all beings.

5.      While living in Michigan from 2000 through 2008, I undertook Buddhist prison ministry work on various occasions.  For example, on several occasions, I provided instruction on Zen sitting practice to a group of teenagers at the Nokomis Challenge Center, a youth detention center

2

that was located in Prudenville, Michigan, but has since closed. I also visited the Standish Maximum Correctional Facility before it closed its doors to discuss Buddhist teachings and provide meditation instruction to several prisoners who requested guidance from a Buddhist priest.

6.      Currently, I am involved in pastoral letter correspondence with several Buddhist prisoners in Indiana as well as another Buddhist prisoner in California.

7.      My pastoral relationship with Wesley Purkey began in January 2009. Mr. Purkey's then-spiritual advisor moved to Arkansas in December 2008 and asked if I would be willing to take over his role as Mr. Purkey's priest. I agreed and had my first visit with Mr. Purkey at USP Terre Haute the following month.

8.      The prison is about 60 miles from my home and takes me an hour and a half to drive there. Since January 2009, I have had monthly visits with Mr. Purkey to provide spiritual guidance and counseling consistent with the Zen Buddhist faith. Quite often, Mr. Purkey brought religious issues and questions raised in Buddhist journals to our visits for us to discuss.

9.      In 2013, Mr. Purkey officially designated me as his Minister of Record (MOR). Attached hereto as Exhibit 1 is a true and correct copy of my email correspondence with prison officials in which they indicate that Mr. Purkey designated me his MOR.

10.      My last visit with Mr. Purkey was in February of 2020. The next month, I learned that my visit scheduled for March 21, 2020, was suspended due to the threat posed by the COVID-19 pandemic. On May 26, 2020, I received an email from the Religious Services Assistant at BOP, indicating that "the Federal Bureau of Prisons has issued a 'Shelter in Place' order that will remain in effect throughout June 30, 2020, at which time it will be re-evaluated." The letter stated that the "unprecedented world-wide public health emergency" was the impetus for the "Shelter in Place" order. Attached as Exhibit 2 is a true and correct copy of the letter. After Mr. Purkey received an

3

execution date, BOP scheduled an MOR visit between Mr. Purkey and me for July 3, 2020. However, on June 26, I informed the BOP that I was unable to attend. It was my understanding that Mr. Purkey did not want visitors at that time. Plus, I was already very concerned about visiting the prison due to the COVID-19 pandemic. My concerns only intensified with the news in the past week of surges in infections across the country. As discussed further below, my age and certain medical conditions put me at high risk for infection and serious illness or death should I become infected.

11.    Although it would be inappropriate, as Mr. Purkey's priest, for me to reveal the specific content of our spiritual-counseling visits, I can attest that Mr. Purkey has demonstrated to me over the years that he is a devoted Buddhist and sincerely believes in the faith.

12.    As Mr. Purkey's priest, he is under my spiritual care. I am bound by my religious duty to be present at his execution, where—on the threshold of death, and at his ultimate moment of crisis—he will suffer the most dire distress.

13.    In the Buddhist faith, death is a transition, a crossing over, to what is after life; it is a liberation from the limitations and sufferings inherent in our condition as separate human beings. However, in order for this liberation process to be successful and peaceful, the presence of an ordained Buddhist priest whom Mr. Purkey knows well and trusts is indispensable. In the absence of a priest at this crucial moment, carrying out the pastoral function by assisting and supporting the crossing-over process, Mr. Purkey may fail to achieve the full liberation and peaceful transition that death represents. A comparable parallel in Christian traditions might be the "last rites" that assure a proper and peaceful death in the throes of the transition between life and death.

14.    Specifically, for Buddhists, the state of mind of a person at the moment of passing away is very significant for that person for karmic reasons, so that having one's priest in attendance to

4

serve as a spiritual guide is truly essential.  As Mr. Purkey's priest, I would deliver a sutra (a chant with content and meaning) and a dharani (a mantra-like chant) as he passes away to facilitate the dying process and convey equanimity to him. During this process, it is important that I am visible to him so he can see my face to remind him of the many hours we spent together and the teachings I shared with him during that time.  In accordance with these principles and the Mahayana Buddhist precepts discussed above, my presence would provide spiritual consolation and compassion to him during this time, helping him attain peace of mind as he leaves this life.

15.     Thus, in order to help provide for a peaceful state of mind and a proper transition and liberation, it is my sacred religious duty to be at Mr. Purkey's execution. My failure to be there would, for me, constitute a troubling violation of my religious tenets and priestly obligations. Given my relationship with Mr. Purkey, which has developed over the course of eleven years, it is inconceivable that I should be absent and fail to share in his final tribulation.

16.     To that end, when Mr. Purkey was initially scheduled for execution on December 13, 2019, I planned to attend the execution. In accordance with BOP regulations, Mr. Purkey designated me as the spiritual advisor who shall be present when his execution is carried out. On November 21, 2019, I received a letter from the BOP noting that Mr. Purkey had selected me to be a witness and requiring me to report to the Vigo County Sheriff's Office parking lot on the day of the execution, where I would be picked up by prison staff and transported to the prison for processing.

17.     Despite the onerous procedures associated with attending the execution that was planned for December 2019, there is no doubt in my mind that I would have attended to fulfill my religious duties.  However, the execution date was postponed.

18.     It is my understanding that a new execution date for Mr. Purkey has been set for July 15, 2020. I was shocked to learn that the BOP would be proceeding with the execution during the

5

pandemic, especially given the fact that the prison had not even been allowing visits to the prison since the middle of March. I immediately became worried that I would not be able to attend without significant risk to my health and life.

19.     Having visited Mr. Purkey at USP Terre Haute many times before, I know that the security procedures, even absent an execution, do not allow for the kind of social distancing that is required by CDC guidelines during the COVID-19 crisis. In my experience as a visitor at Terre Haute, I must first check-in at the entrance of the main building and hand my identification and keys to the guards at the front desk. Then, if there are other visitors who also need to be processed, I have to wait in the waiting room for up to thirty minutes with them. There are about thirty chairs in the waiting room, organized in sets of two or three and in rows no more than a few feet apart from each other.

20.     Once my name is called, a guard takes my photo and asks me to put my shoes, belt, and other property in a plastic bin to pass through a metal detector on a conveyor belt while I walk through a separate metal detector. Afterward, a guard manually inspects my property. I then collect my things and the guard stamps my hand.

21.     At this point, I am confined to another part of the waiting room, where I wait with other visitors an additional period of time—varying from 30 minutes up to, on occasion, 90 minutes. This waiting area is structured similarly to the waiting area at the entrance: It has rows of plastic chairs cramped together and little ability to socially distance from others.

22.     Once a guard collects copies of my photograph from the front desk, I and any other visitors are escorted one-by-one to a third area, a small, confined space where visitors put their stamped hand under a black light. After showing their hands in the black light area, each visitor must remain

6

there waiting for others to do the same. By the end of the black light process, the space can become quite crowded.

23.     The guard then escorts the group of us outside and into a second building. At this point, most of the group breaks off to go in the direction of general population. A guard then escorts me and other Special Confinement Unit (SCU) visitors, if there are any, through several long narrow hallways. On this route, we pass several prisoners and staff in close proximity on our way to an elevator that can hold up to ten people. I am then taken to another check-in desk for the SCU, where I sign a logbook and wait immediately outside of the visiting room.

24.     A different guard unlocks the door to the visiting room where I have a non-contact visit with Mr. Purkey through a plexiglass barrier.  When the visit is over, I have to wait for prison staff to escort me along the same path, back to the main entrance, where I collect my identification and keys on my way out of the facility. During this entire process, from intake until my exit, it is impossible to avoid being in close proximity to many of the individuals I encounter.  On any one visit, it is not uncommon for me to encounter at least a dozen different people, if not more, in close proximity.

25.     I am certain that the security procedures and protocol will be even more stringent on the day of execution than they are under normal visitation conditions. I believe that these procedures will likely require even more contact with guards, as well as extended periods of waiting in close proximity with other attendees and individuals.

26.     I am 68 years old and thus, because of my age, at a high risk for becoming infected with COVID-19 and becoming seriously ill or dying should I become infected.

27.     Beyond my age, I also have suffered several lung-related illnesses that make me medically vulnerable to COVID-19.  In January of 2019, I had a severe case of bronchitis, which lasted four

7

to five weeks and then recurred in March of the same year.  I also have a history of pleurisy, an illness that causes severe lung inflammation and hampers breathing.

28.      Because of my medical vulnerability, I have severely curtailed my contact with others during the pandemic. Before the pandemic, I went to my local library on a near-daily basis. To date, the library is closed, but I do not plan to visit even if it does reopen. I also used to frequent coffee shops regularly. I no longer do so even though many coffee shops have started to reopen at reduced capacity. I also do not currently attend services at my temple. I actively avoid socializing in person and gathering in groups and, instead, I remain sheltered at home. The only time I leave my home is to go grocery shopping, during which I maintain a strict distance from others and wear a mask, or to walk for exercise.

29.      I want nothing more than to fulfill my priestly duties toward Mr. Purkey, but because of the BOP's decision to schedule this execution during a pandemic, I feel substantial pressure to abandon my religious commitments to him. It would be impossible for me to fulfill my religious duties during Mr. Purkey's execution in a way that complies with the CDC guidelines for medically vulnerable populations. As such, I have been placed in the impossible position of violating my religious duties or risking my health and life to carry them out.

30.      If the execution were delayed until a time when there is either an effective COVID-19 treatment or a vaccine, I would be safely able to attend and honor the core tenets of my faith and my religious commitments as Mr. Purkey's priest.

I declare pursuant under penalty of perjury that the foregoing facts are true and correct.


Dale C. Hartkemeyer

8

Dale Hartkemeyer (aka Seigen)
June 30, 2020