**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

|  |  |  |
|---|---|---|
| DALE HARTKEMEYER (AKA SEIGEN) | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:20-cv-00336-JSM-DLP |
| | ) | |
| WILLIAM P. BARR, in his official | ) | |
| capacity as the Attorney General of the | ) | |
| United States; MICHAEL CARVAJAL, in | ) | |
| his official capacity as the Director of the | ) | |
| Federal Bureau of Prisons; and T.J. | ) | |
| WATSON, in his official capacity as | ) | |
| Complex Warden for Terre Haute Federal | ) | |
| Correctional Complex, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF DR. NINA H. FEFFERMAN**

I, Nina Fefferman, certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746:

1.      I am a full Professor at the University of Tennessee, Knoxville in both the Department of Ecology and Evolutionary Biology and the Department of Mathematics. I am also the Director of the Mathematical Modeling Consulting Center at the National Institute for Mathematical and Biological Synthesis, and the Associate Director of the University of Tennessee One Health Initiative. My research focuses on complex adaptive systems, with a focus on the interplay between individual behavior and infectious disease epidemiology. Complex adaptive systems are systems that have a large number of components that interact and adapt such that the system is more complicated than its various parts— for example, living organisms,

economies, or cities.

2.      I have worked for the past 16 years as a researcher of the epidemiology, ecology, and evolution of infectious disease, pandemic preparedness, national biosecurity, and infrastructure protection. I hold a Master's degree in mathematics from Rutgers University and a PhD in Biology from Tufts University.

3.      For over a decade, I was one of the primary researchers of the Command, Control, and Interoperability Center for Advanced Data Analytics, a U.S. Department of Homeland Security ("DHS") Center of Excellence, where I ran a research group focusing on the mathematics of both biosecurity and cybersecurity. As part of my role in that center, I actively contributed models and policy recommendations to DHS and its affiliate agencies for how to manage and mitigate pandemic threats from H1N1 2009 flu, Ebola in West Africa, and Zika virus. I have also consulted for various additional state and federal agencies and private companies, domestically and abroad, in the area of outbreak management since 2004.

4.      My C.V., attached as **Exhibit A**, includes a full list of my honors, experience, and publications.

5.      I am donating my time reviewing materials and preparing this report. Any live testimony I provide will also be provided *pro bono*.

**BASES FOR OPINIONS**

6.      This declaration is based upon my experience modeling COVID-19, my review of the scientific literature regarding COVID-19, and my review of four declarations provided to me by counsel for Rev. Hartkemeyer: (1) a December, 2019 declaration from Rick Winter, an attorney with the Bureau of Prisons (BOP); (2) a July 6, 2020 supplemental declaration from Rick Winter; (3) a June 30, 2020 declaration from Rev. Dale Hartekemeyer; (4) a June 30, 2020

declaration from Tim Floyd; and (5) a July 1, 2020 declaration from Dr. Joe Goldenson.  I quote

here relevant excerpts from each of the first four declarations:

> 7.      From Rick Winter's November 21, 2019 Declaration (paragraphs 4-10):

In advance of the (execution) dates, the BOP has, and intends to continue, making necessary arrangements.

Such arrangements include the activation of the execution team, which consists of over **40 BOP staff members**. These staff members will, by necessity, be removed from their normal duties, **which include a wide range of correctional and administrative positions within the BOP**. Pursuant to the current operational plan, these staff members are **scheduled to cease their normal duties several days in advance of a scheduled execution,** in order to give the team time to practice and prepare for their role in an execution. In addition to the team members, **a number of BOP administrators will be present as well, also ceasing their normal duties in the days in advance of an execution**. Logistical items such as travel, lodging and personal arrangements have already begun for the two execution dates in December.

Additionally, the BOP plans to **use contractors** who have made themselves available and presumably have made any necessary arrangements for personal and work related matters based on the executions scheduled in December.

Executions are scheduled to take place at the Federal Correctional Complex at Terre Haute, Indiana (FCC Terre Haute). Accordingly, FCC Terre Haute is also mobilizing personnel in preparation of the currently scheduled executions. In preparation, FCC Terre Haute has also been coordinating with **federal, state, and local law enforcement agencies**, some of whom have indicated their **plans to send personnel to FCC Terre Haute** to help maintain security for the currently scheduled executions.

Approximately **200 FCC Terre Haute staff** will serve as institution security and support during an execution. With its **staff pulled away from their normal duties**, FCC Terre Haute **will not be able to operate under normal conditions**. For example, due to expected staffing issues and changes in security procedures, FCC Terre Haute **will not be able to prepare inmate meals** in the ordinary fashion. Instead, the institution plans to prepare food in advance for its approximately 2,600 inmates. This alteration in meal preparation comes at a greatly increased cost to the BOP.

Additionally, FCC Terre Haute has made arrangements for specific needs related solely to an execution, for example **contracting for buses which will be used to transport public demonstrators** who wish to assemble.

Schedules for FCC Terre Haute staff members are currently being created, allocating staff based on current execution dates. For additional security and support, specialized BOP teams such as Special Operations Response Teams (SORT) and Disturbance

Control Teams (DCT) **will travel to FCC Terre Haute from other BOP institutions**. **These teams consists of approximately 50 individuals**. Again, logistical arrangements such as **travel and lodging** have already begun for the current execution dates.

8.      From Rick Winter's July 6, 2020 Declaration (paragraphs 7 -14):

The Terre Haute Federal Correction Complex (FCC Terre Haute) consists of USP Terre Haute, as well as a Federal Correctional Institution (FCI Terre Haute) and a prison camp. Mr. Purkey is housed at USP Terre Haute's Special Confinement Unit (SCU). There have been zero cases of COVID-19 in the SCU, with two inmates having been tested. Staff at FCC Terre Haute are required to pass a temperature check and symptom screening daily before being allowed on the grounds of FCC Terre Haute. As of July 2, 2020**,** ninety tw**o** staff members at FCC Terre Haute have been tested for COVID-19. Of those, one staff member at the FCI previously tested positive but has recovered. At the USP, no staff members have tested positive for COVID-19. No FCC staff members are currently positive.  for COVID-19. As for the inmate population, 264 USP inmates have completed tests. **Four USP inmates are currently positive for COVID-19**. Tests have been conducted on 141 FCI inmates; **one FCI inmate is currently positive**. See https://www.bop.gov/coronavirus/. All BOP staff are required to wear face masks**. BOP has no plans to conduct COVID testing on individuals involved in the execution in advance of the execution.** FCC Terre Haute will continue its screening procedures.

If Rev. Hartkemeyer chooses to visit Mr. Purkey in the days prior to the execution, that visitation will occur in the SCU. I understand that Rev. Hartkemeyer will need to drive approximately 60 miles from his home to FCC Terre Haute. **Upon his arrival at FCC Terre Haute, he will be given the opportunity to utilize Personal Protective Equipment ("PPE"), in the form of a surgical face mask, gloves, a gown, and a plastic face shield**. He will be **escorted through security by BOP staff** wearing face masks to a SCU visiting room only utilized by visitors of SCU inmates. The visiting room allows non-contact visitation—i.e., the inmate is separated from his visitor by a partition—and is sanitized after each use. Once inside the USP, Rev. Hartkemeyer will also be given access to hand sanitizer and a restroom with a sink and hand soap.

During any such visit, Rev. Hartkemeyer will have no interaction with any other inmates housed at SCU or elsewhere. Additionally, Rev. Hartkemeyer will have no interaction with other visitors or members of the public at the SCU because regular visitation remains suspended due to COVID-19. If the other inmates scheduled for execution also have visitors, such visits will take place in separate area.

If **Rev. Hartkemeyer chooses to attend the execution, his interaction with BOP staff and other individuals will be limited**. He will not have direct interaction with, nor be near, the vast majority of individuals expected to be present for Mr. Purkey's execution. His only possible interaction with members of the public may be with Mr. Purkey's legal team, who, like other witnesses, will be provided PPE if they desire.

As to Plaintiff's interaction with BOP employees, while the execution team consists of

**approximately 40 BOP staff members**, the vast majority of them have assignments in areas other than the rooms in which Rev. Hartkemeyer will be located. Similarly, while approximately **100 BOP staff** members and approximately **50 members** of specialized teams will have various roles in the overall security of FCC Terre Haute, their duties will not cause them to have any interaction with Rev. Hartkemeyer. Rev. Hartkemeyer will only have interactions with those security officers in the specific areas in which he needs to be. Furthermore, Rev. Hartkeymeyer should have no interaction with the victim's witnesses, media, or demonstrators, as those groups are separated from each other by design. See Ex. A-1 at 23, 26-27.

On the day of his execution, Mr. Purkey will be taken from the SCU to the execution facility, which is a separate facility from USP Terre Haute. Rev. Hartkemeyer will be given the opportunity to visit Mr. Purkey at the execution facility. In order to do so, he will again be met at a designated area and will be given the opportunity to utilize PPE in the form of a surgical face mask, gloves, a gown, and a plastic face shield. He will then be subject to a brief **escort to the execution facility where he will be met by a BOP employee who will then escort him** throughout the execution facility grounds. That BOP security escort will wear an N-95 face mask, a face shield, and gloves while in close proximity with Rev. Hartkemeyer.

At the execution facility, Rev. Hartkemeyer's visit will again be non-contact. The equipment and surfaces in the area of the visit will be disinfected prior to use.  At the conclusion of the visit, Rev. Hartkemeyer **will be escorted away** from the visiting area of the execution facility.

For the actual execution, Rev. Hartkemeyer's **BOP security escort** will take to a room adjacent to the execution room.  Shortly prior to curtains opening, his BOP security escort will lead him into the execution room itself for a brief non-contact visit with Mr. Purkey. Rev. Hartkemeyer will then be permitted to **remain the execution room with the assigned BOP security escort** during the execution procedure.  See Ex. A-2**. In addition to Mr. Purkey, Rev. Hartkemyer, and his security escort**, the only **other individuals who will be present in the execution room are a United States Marshals' representative and a BOP official** – both of whom will be at a social distance from Rev. Hartkemeyer.

9.      From Rev. Harktemeyer's Declaration (paragraphs 19-27):

Having visited Mr. Purkey at USP Terre Haute many times before, I know that **the security procedures**, even absent an execution, **do not allow for the kind of social distancing** that is required by CDC guidelines during the COVID-19 crisis. In my experience as a visitor at Terre Haute, I must first check-in at the entrance of the main building and hand my identification and keys to the guards at the front desk. Then, if there are other visitors who also need to be processed, I have to wait in the waiting room for up to thirty minutes with them. There are about thirty chairs in the waiting room, organized in sets of two or three and in rows no more than a few feet apart from each other.

Once my name is called, a guard takes my photo and asks me to put my shoes, belt, and other property in a plastic bin to pass through a metal detector on a conveyor belt while I walk through a separate metal detector. Afterward, a guard manually inspects my property. I then collect my things and the **guard stamps my hand**.

At this point, I am confined to another part of the waiting room, where I wait with other visitors an additional period of time—varying from 30 minutes up to, on occasion, 90 minutes. This waiting area is structured similarly to the waiting area at the entrance: It has rows of plastic chairs cramped together and little ability to socially distance from others.

Once a guard collects copies of my photograph from the front desk, **I and any other visitor are escorted one-by-one to a third area, a small, confined space where visitors put their stamped hand under a black light**. After showing their hands in the black light area, each visitor must remain there waiting for others to do the same. By the end of the black light process, the space can become quite crowded.

The guard then escorts the group of us outside and into a second building. At this point, most of the group breaks off to go in the direction of general population. **A guard then escorts me** and other Special Confinement Unit (SCU) visitors, if there are any, through several long narrow hallways. On this route, **we pass several prisoners and staff in close proximity on our way to an elevator that can hold up to ten people**. I am then taken to another check-in desk for the SCU, **where I sign a logbook** and wait immediately outside of the visiting room.

**A different guard** unlocks the door to the visiting room where I have a non-contact visit with Mr. Purkey through a plexiglass barrier. When the visit is over, I have to wait for **prison staff to escort** me along the same path, back to the main entrance, where I collect my identification and keys on my way out of the facility. During this entire process, from intake until my exit, **it is impossible to avoid being in close proximity** to many of the individuals I encounter. On any one visit, it is not uncommon for me to encounter at least a dozen different people, if not more, in close proximity.

I am certain that the security procedures and protocol will be even more stringent on the day of execution than they are under normal visitation conditions. I believe that these procedures will likely require even more contact with guards, as well as extended periods of waiting in close proximity with other attendees and individuals.

I am **68 years old** and thus, because of my age, at a high risk for becoming infected with COVID-19 and becoming seriously ill or dying should I become infected. Beyond my age, I also have suffered several lung-related illnesses that make me medically vulnerable to COVID-19.

10.     Timothy Floyd June 30, 2020 declaration, paragraphs 4 to 6:

Though the Death House is separated from the main prison building, Death House

visitors are required to clear a security checkpoint at the main building before they are cleared to visit the Death House. Each day, I made several trips off the prison grounds for meals and to work on obtaining a stay of execution. Each time I returned I followed the same process.

The Death House was a very small building, with several rooms. While there, Mr. Jones was held in a very small cell with a twin-sized cot. When I visited Mr. Jones, I was brought by prison staff to a **small enclosed area** connected to Mr. Jones's cell where I could speak to him through a plexiglass window. The plexiglass had holes that allowed us to hear one another more clearly, and a compartment that we used to pass documents back and forth. Mr. Jones used this compartment to pass me a message that he asked me to read to the media on the morning of his execution.

In the days leading up to Mr. Jones's execution, **I shared this cramped visitation space with three spiritual advisors and with Mr. Jones's daughter**, who flew from Columbus, Georgia to be with her father on his last days. Regardless of whether we were sitting or standing, we **were shoulder-to-shoulder so that we could all fit in the room** at once.

## OPINIONS

11.     The BOP plans for holding the federal execution of Wes Purkey on July 15, 2020 as described in the Rick Winter declarations are a serious cause for concern for the spread of COVID-19.  Specifically, I have identified four areas of risk from this plan:

12.     First, the plan involves risks to all of the individuals who will be traveling to the Terre Haute facility.  Airplane travel, staying in hotels, and eating at restaurants all carry risks and anyone attending the execution as either a witness or staff may become exposed through this travel.

13.     Second, the execution plan involves substantial risks that incoming BOP staff, contractors, or witnesses will bring infection to the prison complex, and spread infection to staff within the prison facility and to prisoners.   The Winter declarations describe a large number of individuals who will be traveling to and within the facility.  The BOP's policy since March of 2020 of prohibiting visitation is to stem this type of spread, from outsiders carrying infections into federal prison facilities.  The introduction of potential new sources of infection in prisons is particularly concerning because of the maintenance of higher rates of contact amongst susceptible

incarcerated people, due to the density and structure of prison housing arrangements (including limited ability to isolate potentially exposed individuals), the lack of social distancing, inadequate facilities for personal hygiene, difficulty in maintaining adequate disinfection of high-touch surfaces, and poor ventilation within prisons. These dynamics drive the resulting efficacy of any proposed interventions.

14.     The Winter I declaration refers to multiple days of training and practice, suggesting that the outside BOP staff will be mixing with BOP Terre Haute staff for multiple days, increasing the likelihood of spread within the prison.  It describes pulling individuals from across the facility, increasing the risk of new interactions and exposure among Terre Haute staff, as well as increasing the exposures from the out of town individuals.  The Winter II declaration describes multiple days of visitation, in multiple locations for Rev. Hartkemeyer, again increasing the exposure and risk.  Multiple days of resident and staff mixing in the tight enclosures of the prison facilities increase risk of spread of the disease throughout the facility.

15.     The concern for spread within the prison by the days of training and preparation is further heightened because the plan to pull significant numbers of staffing itself adds pressure to the system for likelihood of spread within the prison.  Reduced staffing risks that staff will have a slower response time to respond to individuals who become sick and need medical attention, thereby also increasing the exposure times for cell-mates of those developing symptoms.  There are other areas of concern. For example, without adequate staffing, the distribution plan for meals or medications could require additional movement or gathering of large groups and spread across the facility, increasing exposures.

16.     Even if the BOP follows through with its plan to provide some of visitors and staff with certain PPE (N-95 masks will not be provided to visitors), the risk of exposure and transmission of COVID-19 will remain significant.  The lack of testing is a major concern,

compounded by the fact that some BOP staff may be coming from prisons with documented large-scale outbreaks.

17.     Third, the plan for holding the executions itself risks transmission because of the number of people coming inside, interacting in tight quarters, in a high-risk interaction with a shared ventilation system.

18.     Fourth, the final area of concern is the very real probability that some of the individuals attending the training, visitation, and/or execution will become exposed and take the virus home with them, increasing the overall national level of risk.  Without contract tracing, exposures in this kind of large-scale event will be hard to control and prevent from spreading infection, including to some communities where levels may be sufficiently low such that the introduction of a new infection significantly increase the difficulty in controlling spread in the community.

19.     The risks to Rev. Hartkemeyer posed by this plan are significant.  There are repeated points of close person to person contact between him and BOP staff, including those who will have been exposed during the multiple days of training and preparation.  The execution itself is a highly risky setting without an opportunity to socially distance from multiple other individuals.  He risks becoming exposed to COVID-19, even if he wears the PPE that the BOP has said it will provide.  As a medically vulnerable individual, this exposure is of grave concern.

I declare under penalty of perjury that the foregoing declaration is true and correct.

Nina H. Fefferman, PhD                                        July 8, 2020