IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

DALE HARTKEMEYER,
Plaintiff-Appellant

and

FATHER MICHAEL O'KEEFE,
Intervening Plaintiff-Appellant

No. 20-2262

v.

WILLIAM P. BARR, Attorney General of the United
    States, et al.,
Defendants-Appellants

**OPPOSITION TO MOTION TO STAY EXECUTIONS PENDING
APPEAL**

DAVID M. MORRELL
  *Deputy Assistant Attorney General*
JOSH J. MINKLER
  *United States Attorney*
SOPAN JOSHI
  *Senior Counsel to the Assistant
  Attorney General*
PAUL R. PERKINS
  *Special Counsel*
MICHAEL S. RAAB
MELISSA N. PATTERSON
LOWELL V. STURGILL JR.
AMANDA L. MUNDELL
ASHLEY A. CHEUNG
  *Attorneys, Appellate Staff
  Civil Division, Room 7241
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-3427
  Lowell.Sturgill@usdoj.gov*

## INTRODUCTION AND SUMMARY OF ARGUMENT

Yesterday morning, the district court (Magnus-Stinson, C.J.) correctly declined to enjoin two federal executions, appropriately rejecting plaintiffs' unprecedented theory that spiritual advisors permitted to attend an execution have the right under federal law to halt it. The court's ruling properly applies controlling precedent from both this Court and the Supreme Court. Moreover, the capital sentences at issue here – for Wesley Purkey and Dustin Lee Honken – have been repeatedly upheld by federal courts, and the inmates' own efforts to halt their implementation have recently been rejected by the Supreme Court. It would be manifestly inequitable to issue a last-minute injunction preventing these two lawful executions in order to facilitate the religious exercise of third parties. Indeed, last night at 2:00 a.m., the Supreme Court summarily reversed a district court that had entered a last-minute injunction against a third inmate's execution at 10:00 the prior morning, even though the district court there had relied on the inmate's *own* Eighth Amendment right against cruel and unusual punishment. Especially in light of that precedent, this Court should deny plaintiffs' motion for an injunction pending appeal, so that the government may proceed with these executions on July 15 and 17, 2020, as scheduled.

Plaintiffs are two priests designated by Purkey and Honken, respectively, to attend their executions. These executions were originally scheduled for December 2019 and January 2020; after a stay entered by another court was lifted in June 2020, the Federal Bureau of Prisons (BOP) promptly rescheduled them for July 2020.

Plaintiffs contend that this rescheduling decision burdens their ability to attend the executions, arguing that doing so would risk their health given the current COVID-19 pandemic. In the district court, plaintiffs asked that the executions be indefinitely delayed under either the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.*, or the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, until a COVID-19 treatment or vaccine has been developed and they can attend the execution without concern regarding viral exposure.

The district court correctly denied plaintiffs' request for a preliminary injunction under controlling Supreme Court and Circuit precedent. Plaintiffs do not challenge the court's ruling that they have not proved a likelihood of success with respect to the APA; accordingly, that claim is now abandoned. And as to RFRA, the government's internal decisions regarding the scheduling of *someone else's* execution have at most an incidental effect on *plaintiffs'* religious exercise, and are therefore not the kind of direct compulsion that constitutes a substantial burden imposed by the government on the exercise of religion. As a result, this Court need not address RFRA's compelling interest/least restrictive means element. But even if plaintiffs' concerns regarding possible viral exposure did amount to a substantial burden under RFRA, the government's extensive array of precautions to mitigate risks to witnesses represents the least restrictive means of achieving the government's compelling interest in the prompt implementation of these lawfully imposed sentences.

Although plaintiffs' inability to show a likelihood of success on the merits is dispositive, the balance of equities independently weighs against granting plaintiffs' requested relief. Again, the Supreme Court has resoundingly reaffirmed the strong governmental interest in implementing capital sentences in a timely manner. Plaintiffs' concerns regarding the possibility of viral exposure do not establish their irreparable harm, let alone one that outweighs that governmental interest, particularly given the lengthy delay in implementing these sentences and the brutality of the crimes these inmates committed. This court should summarily deny their request for extraordinary relief and permit the government to carry out the scheduled executions.

## STATEMENT

### A. Background

The capital sentences implicated here were imposed over fifteen years ago. Purkey kidnapped, raped, murdered, and dismembered a 16-year-old girl after transporting her across state lines. *In re FBOP Execution Protocol Cases* (*Execution Protocol Cases*), 955 F.3d 106, 127 (D.C. Cir. 2020) (Katsas, J., concurring). Honken murdered two prospective federal witnesses, along with one of their girlfriends and her two young daughters, aged six and ten. *Id.*

Federal executions are governed by the FDPA and its implementing regulations, which afford the BOP Director broad discretion to designate the date and time of a federal execution. *See* 28 C.F.R. § 26.3(a). "If the date designated for execution passes by reason of a stay of execution, then a new date shall be designated

3

promptly by the Director of the Federal Bureau of Prisons when the stay is lifted." *Id.*

Upon BOP's adoption of a new lethal-injection protocol in July 2019, it scheduled the

executions of several inmates, including Purkey and Honken, who had exhausted all

proper avenues of post-conviction relief, for December 2019 and January 2020.

Purkey and Honken were among a group of death-row inmates who challenged that

protocol in federal court; on the inmates' motion, the district court entered a

preliminary injunction, *see* Case No. 1:19-mc-00145 (D.D.C.), Dkt. Nos. 50, 51, which

the D.C. Circuit vacated, *see Execution Protocol Cases*, 955 F.3d at 108–13 (per curiam).

On June 15, 2020, shortly after the D.C. Circuit issued its mandate and thereby lifted

the injunction barring these executions, the government rescheduled them for July

13–17 and August 28, 2020.  On June 29, 2020, the Supreme Court denied the

inmates' petition for a writ of certiorari and their stay request.  *See Bourgeois v. Barr*,

2020 WL 3492763, at *1 (U.S. 2020) (mem.).[1]

In March 2020, BOP issued a "Shelter in Place" order in response to the

COVID-19 outbreak and suspended religious visits through June 30, 2020.  Dkt. 1, at

17.  Once BOP rescheduled executions, however, it reinstated the affected inmates'

visiting privileges, including religious visits with plaintiffs to resume in the week

---

[1] Purkey and other inmates with rescheduled execution dates jointly sought a new preliminary injunction in the District Court for the District of Columbia.  *See* Case No. 1:19-mc-00145 (D.D.C.), Dkt. No. 102.  The district court granted their request and issued an injunction barring their executions based on Eighth Amendment grounds, but the Supreme Court summarily vacated the court's injunction 16 hours later.  *Barr v. Lee*, No. 20A8, 591 U.S. ___ (2020) (per curiam).

preceding an execution. Dkt. 33-1, at 13. To reduce the possible spread of COVID-19 during this time, BOP took numerous precautions. *See* Dkt. 33-1, at 2; Dkt. 65-1, at 2-3. Among these: all BOP staff must wear face masks and pass a temperature check and symptom screening each day upon arrival. Dkt. 33-1, at 3. In the week before an execution, BOP permits plaintiffs to visit the relevant inmates in the Special Confinement Unit (SCU) of USP Terre Haute, where there are no COVID-19 cases, in a no-contact room that is disinfected after use. *Id.* at 2-3. BOP also provides plaintiffs with PPE which they are permitted to don while at the SCU. *Id.* On the day of the execution, BOP will allow plaintiffs to wear PPE, limit their interactions with staff and other visitors, have a pre-execution no-contact visit in a disinfected room with a glass partition in the execution facility, and be in the execution chamber (at a social distance from the inmate and the only two other individuals in the room aside from their BOP security escort) during the proceedings. *Id.* at 4-5; Dkt. 65-1, at 2.

## B. District Court Proceedings

On July 2, 2020, plaintiff Hartkemeyer filed suit to halt the scheduled July 15 execution of Purkey, for whom he serves as the Minister of Record under BOP procedures. Hartkemeyer claimed that his religious beliefs compelled him to attend the execution in order to administer final spiritual rites, but that doing so during the current COVID-19 outbreak would endanger his health. Dkt. 1, at 19. Hartkemeyer therefore asserted that the scheduled execution date would substantially burden the free exercise of his religion in violation of RFRA. *Id.* He also argued that BOP's

5

decision to move forward with the execution in July was arbitrary and capricious in violation of the APA. Hartkemeyer sought a preliminary injunction "prohibiting the BOP from carrying out the execution" indefinitely, "until treatment or a vaccine is available." Dkt. 1, at 23; Dkt. 7.

On July 7, Honken's priest, plaintiff O'Keefe, moved to intervene in this litigation, which the district court granted, *see* Dkt. 42; 54. O'Keefe then separately sought a preliminary injunction of Honken's execution, adopting and incorporating by reference the arguments raised by Hartkemeyer. *See* Dkt. 61 at 2.

On July 9, the court held a status conference, and on July 12, the court ordered the government to file a surreply in opposition to plaintiffs' motions for a preliminary injunction, explaining the degree to which BOP's protocol minimized the risk of COVID-19 transmission to plaintiffs; the status of the prison's ventilation system; the expert medical or scientific advice that informed the protocol; and any changes to the protocol in response to a recent COVID-19 test result by a BOP staff member. The government complied with the court's request the next morning, on July 13. *See* Dkt. 81. Among other things, the government informed the court that BOP's mitigation measures are consistent with guidelines issued by the Center for Disease Control and Prevention (CDC) for correctional facilities and detention centers during the COVID-19 outbreak, *id.* at 3, and that that the World Health Organization has opined that there is little to no potential for airborne transmission of COVID-19 through ventilation systems in settings such as this where a facility has taken the precautions

6

BOP already has put in place.  *Id.*  Finally, the government assured the court that the BOP staff member who recently tested positive for COVID-19 did not have any contact with the BOP Execution Protocol team, did not visit the execution facility or its adjacent command center, does not recall having contact with the Crisis Support Team (who transports execution witnesses) or any of its transport vehicles, and does not recall being in the witness staging area.  *Id.* at 4.  BOP has already taken steps to identify all of the potential individuals that the infected staff member may have been in contact with and will ensure that those individuals have no contact with any others involved or attending this week's executions.  *Id.* at 5.

On July 14, 2020, the district court denied plaintiffs' motions for a preliminary injunction. *See* Dkt. 84.  With respect to RFRA, the court held that plaintiffs have no more than a "negligible" likelihood of success of meeting RFRA's substantial burden requirement, *id.* at 5, which demands that a plaintiff identify "some government action with a 'tendency to coerce individuals into acting contrary to their religious beliefs.'" *Id.* at 4 (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988)). Plaintiffs likely cannot meet that obligation here, the court held, because "the mere scheduling of an execution imposes no obligation or restriction on the religious advisor whom the condemned prisoner has selected to attend." *Id.* at 4 (noting the government's argument that the plaintiffs are "'not themselves the subject of government regulation,'" and that "'[t]he only impediment Rev. Hartkemeyer identifies—the global pandemic—is not one of the Government's making'"). The

court further observed that while plaintiffs allege the government's COVID-19 precautions are insufficient to protect them, their complaints only challenged the *scheduling* of the executions; plaintiffs did not seek an injunction requiring the government to provide any additional safety measures. *See id.* at 5.

The court also held that plaintiffs have not shown more than a negligible likelihood of success on their APA claim, observing this Court's recent holding that where, as here, BOP complies with the applicable regulatory requirements, BOP has "unconstrained discretion" to set an execution date. *Peterson v. Barr* No. 20-2252, 2020 WL 3955951 (7th Cir. Jul. 12, 2020) at *2. *See* Dkt. 84 at 5-6. As noted, plaintiffs do not challenge that holding on appeal.[2]

## ARGUMENT

This Court evaluates a motion for an injunction pending appeal, which is what plaintiffs are in effect asking for here, "using the same factors and 'sliding scale' approach that govern an application for a preliminary injunction." *Grote v. Sebelius*, 708 F.3d 850, 853 n.2 (7th Cir. 2013). *See also Respect Main PAC v. McKee*, 562 U.S. 996

---

[2] On July 2, 2020, this Court affirmed the dismissal of Purkey's petition for a writ of habeas corpus under 28 U.S.C. § 2241, but entered a stay of his execution date, which "will expire upon the issuance of th[e] court's mandate or as specified in any subsequent order that is issued." *Purkey v. United States*, No. 19-3318, Dkt. No. 36, at 27 (7th Cir.). On July 4, 2020, the United States filed an emergency petition for panel or en banc reconsideration of this stay, which this Court denied. *See id.*, Dkt. 46. The government then filed an application in the Supreme Court to vacate this Court's stay of Purkey's execution. *See Watson v. Purkey*, No. 20A4 (S. Ct.). That application remains pending at this time.

(2010) (denying injunction pending appeal and explaining that such a request "demands a significantly higher justification than a request for a stay" because it "does not simply suspend judicial alternation of the status quo but grants judicial intervention that has been withheld").  "The moving party must establish that it has '(1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits.'" *Grote*, 708 F.3d at 853.  "Once the threshold arguments are met, the court weighs the equities, balancing each party's likelihood of success against the potential harms." *Id.*; *see also GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (a court must deny a motion for a preliminary injunction if the movant cannot demonstrate the "threshold" requirement of likelihood of success).

The district court denied plaintiffs' request for a preliminary injunction because of their "slim chances of success" on the merits, pretermitting the need to address the other preliminary injunction factors.  Dkt. 84 at 6.  This Court may affirm on the same ground, but as explained below, the other relevant factors independently weigh against an injunction pending appeal.

## I.      Plaintiffs Cannot Establish A Likelihood Of Success On The Merits.

The district court correctly held that plaintiffs have no more than a "negligible" likelihood of success on their RFRA claim.  Dkt. 84, at 5.  RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the

burden results from a rule of general applicability" unless the government

"demonstrates that application of the burden to the person—(1) is in furtherance of a

compelling governmental interest; and (2) is the least restrictive means of furthering

that compelling governmental interest." 42 U.S.C. §§ 2000bb-1(a), (b). As the district

court correctly recognized, the government's scheduling of these capital sentences

does not substantially burden plaintiffs' religious exercise. As a result, this Court need

not consider whether the government has chosen the least restrictive means of

furthering its compelling interest in carrying out these long-delayed sentences. But

the government also satisfies that requirement.

### A. The Government's Execution Schedule Imposes No Substantial Burden On Plaintiffs' Exercise Of Religion.

As the district court correctly observed, "to show a government-created

substantial burden, a plaintiff must identify some government action with a 'tendency

to coerce individuals into acting contrary to their religious beliefs.'" Dkt. 84 at 4

(quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988)). The

free exercise of religion "affords an individual protection from certain forms of

government *compulsion*; it does not afford an individual a right to dictate the conduct

of the Government's internal procedures." *Bowen v. Roy*, 476 U.S. 693, 700 (1986)

(emphasis added).[3]

---

[3] While *Lyng* and *Bowen* involved First Amendment challenges, plaintiffs implicitly concede that the analysis in those cases properly informs the interpretation of RFRA because they were decided under the pre-*Employment Division, Department of Human*

The district court rightly concluded that plaintiffs here cannot show any government compulsion, as the "mere scheduling of an execution imposes no obligation or restriction on the religious advisor whom the condemned prisoner has selected to attend." Dkt. 84, at 4. The "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs," do not constitute a substantial burden on the free exercise of religion, whether or not the government "bring[s] forward a compelling justification for its otherwise lawful actions." *Lyng*, 485 U.S at 450-51.

Plaintiffs' RFRA claim fails under that rule. Scheduling—or rescheduling— decisions regarding the execution of others' sentences are precisely the type of "internal affairs" that the government is not obliged to alter to "comport with the religious beliefs of particular citizens." *Bowen*, 476 U.S. at 699. In that respect, plaintiffs' claims mirror those of the plaintiffs in *Lyng*, where the Court held that the government was not required to alter its intended use of its own land in response to the assertion of certain Indian tribes that the intended use would "clearly render any

---

*Resources of Oregon v. Smith*, 494 U.S. 872 (1990) substantial burden/compelling interest test RFRA restored as a matter of federal statutory right. *See, e.g.*, *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, No. 19-431 (U.S. Jul. 8, 2020) (Alito & Gorsuch, JJ., concurring) (citing *Bowen* in analyzing a RFRA claim); *Navajo Nation v. United States Forest Service*, 535 F.3d 1058, 1071-73 (9th Cir. 2008) (en banc) (same).

meaningful continuation of traditional [religious] practices *impossible*." 485 U.S. at 451 (emphasis added).

As the district court explained, the government's scheduling decisions do not involve any compulsive measures touching on plaintiffs' free exercise of religion. *See* Dkt. 84, at 4 (noting that "[t]he mere scheduling of an execution imposes no obligation or restriction on the religious advisor whom the condemned prisoner has selected to attend"). The government has not flatly prohibited plaintiffs from attending the execution or coercively imposed any financial or other penalty on plaintiffs for doing so. At most, the government's execution timeline imposes an "incidental interference with [plaintiffs' individual] spiritual activities," without "penaliz[ing] religious activity by denying any person equal rights, benefits, [or] privileges." *Lyng*, 485 U.S at 449-50; *see also Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, No. 19-431 (U.S. Jul. 8, 2020) (Alito & Gorsuch, JJ., concurring) (noting that "in *Bowen*, the objecting individuals were not faced with penalties or 'coerced by the Governmen[t] into violating their religious beliefs,'" even though their religious practices were rendered impossible).

To the contrary, the government has granted extensive access to plaintiff priests to provide pastoral care in connection with inmates' executions, *see* Winter Decl., Dkt. 33-1, at 4-5; Winter Decl., Dkt. 52-1, ¶ 7, and undertaken robust measures to facilitate their attendance by taking numerous steps to minimize COVID-19 risks in accordance with CDC guidance. *See supra*, pp. 4-5. Such actions bear no

12

resemblance to coercive governmental policies directly regulating RFRA claimants in the cases plaintiffs cite. *See Korte v. Sebelius*, 735 F.3d 654, 683-84 (7th Cir. 2013) ("ruinous fines"); *Koger v. Bryan*, 523 F.3d 789 (7th Cir. 2008) (denial of inmate request for non-meat diet); *Thompson v. Holm*, 809 F.3d 376 (7th Cir. 2016) (daily nutrition for prisoners); *Nelson v. Miller*, 570 F.3d 868 (7th Cir. 2009) (same).[4] Likewise, plaintiffs can derive no support from citing *Sherbert v. Verner*, 374 U.S. 398 (1963), as the government there was directly regulating the plaintiff, by denying her application for benefits because of her refusal to work on Saturdays. Here, again, the government is not substantially burdening plaintiffs' religion, but merely carrying out its internal affairs in scheduling the Purkey and Honken executions. Any effect plaintiffs feel is purely incidental to those internal tasks and thus insufficient to satisfy RFRA's substantial-burden requirement. *See Lyng*, 485 U.S at 450-51.

Moreover, plaintiffs' position would necessarily lead to absurd consequences. For example, plaintiffs do not address why they could not assert a RFRA claim if they happened to be unavailable to attend the executions on the date the government has chosen for personal or other reasons beyond the government's control. Nor can they

---

[4] Plaintiffs cannot, of course, invoke the *inmates'* free-exercise rights. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Accordingly, both *Murphy v. Collier*, 139 S. Ct. 1475 (2019), and *Gutierrez v. Saenz*, No. 19-8695, 2020 WL 3248349 (U.S. June 16, 2020), are inapposite, as both cases involved condemned inmates' challenges to state policies denying or limiting the presence of religious advisors in the execution room during the execution. Here, the government will not prevent plaintiffs from being present during the executions.

explain why their RFRA claim would be limited to ministers, without extending, for example, to any and all individuals who have a sincere religious belief that they should oppose executions by traveling to the prison to pray outside of it.

Plaintiffs contend (Mot. 18) that BOP regulations render them more than "incidental" bystanders to the executions, but that is doubly wrong. *First*, *Bowen* and *Lyng* make clear that whether plaintiffs are "incidentally" burdened turns on whether or they are directly regulated by the challenged government policy, not whether they are foreseeably harmed. For example, in *Lyng*, the government did not dispute that the government's use of its own land "could have devastating effects on traditional Indian religious practices." 485 U.S. at 451. *Second*, in any event, this Court's recent decision in *Peterson v. Barr*, No. 20-2252, 2020 WL 3955951 (7th Cir. July 12, 2020), forecloses plaintiffs' argument. As *Peterson* explained, 28 C.F.R. § 26.4—which governs all witnesses, including an inmates' "friends or relatives," *id.*—merely "specifies who may be *permitted* by the Warden to attend an execution," 2020 WL 3955951, at *3.[5] The regulation thus reflects "a limitation on, not an entitlement to,

---

[5] That plaintiffs' claim here involves religious or spiritual advisers that the prisoners selected to attend, rather than citizens selected by the Warden (as in *Peterson*), does not change the analysis. "[C]itizens" and "spiritual adviser[s]" are addressed in parallel and successive provisions of the regulation, and both are subject to numerical caps: each prisoner may select "[n]ot more than . . . [o]ne spiritual adviser," just as the Warden may select "[n]ot more than . . . [e]ight citizens." 28 U.S.C. § 26.4(c). Thus, as to both categories, the regulation acts as "a limitation on, not an entitlement to" attendance, and it does not give plaintiffs—or any other potential attendee—"a right to require the BOP to schedule [the] execution at a time when they are willing or able to attend." *Peterson*, 2020 WL 3955951, at *3.

14

witness attendance," and nothing therein "gives the plaintiffs a right to require the BOP to schedule [the] executions at a time when [plaintiffs] are willing to able to attend" or "require their attendance before the execution may proceed." *Id.* (rejecting as "frivolous" claims to halt an execution by putative witnesses brought pursuant to the APA). Plaintiffs' interpretation would convert the permissive regulation into a license for a spiritual advisor to obstruct an execution by asserting an inability to attend, which cannot be right.

**B. The Current Execution Schedule And Protective Measures Are The Least Restrictive Means To Accomplish A Compelling Government Interest.**

Because plaintiffs cannot establish that BOP's scheduling of these executions imposes a substantial burden on their religious exercise, their RFRA claims fail and the analysis could stop there. *See, e.g., Navajo Nation*, 535 F.3d at 1978. But they cannot satisfy RFRA's other requirements either, because the scheduling here satisfies RFRA's strict scrutiny. As the Supreme Court has repeatedly emphasized, the government has a compelling interest in the timely enforcement of a capital sentence. *See, e.g., Bucklew v. Precythe*, 139 S. Ct. 1112, 1133 (2019). Those significant interests are "frustrated" by extensive delays, *id.*, which can even "undermine [capital punishment's] jurisprudential rationale by reducing its deterrent effect and retributive value," *id.* at 1144 (Breyer, J., dissenting) (quotation marks omitted, alteration in original). The relevant regulations underscore that interest, by contemplating that any stayed executions will be rescheduled "promptly." 28 C.F.R. § 26.3(a)(1).

Plaintiffs assert (Mot. 19-20) that the government lacks a compelling interest in proceeding because the government did not schedule these executions for a number of years after inmates exhausted their post-conviction remedies in 2014 (Purkey) and 2015 (Honken). As of 2011, however, lethal-injection drugs that had previously been available were no longer available, and the government properly "took time to study the successful track record of pentobarbital" before adopting a protocol utilizing it." *Execution Protocol Cases*, 955 F.3d at 128 (Katsas, J., concurring). The government "can hardly be faulted for proceeding with caution," *id.*, and carefully attending to the important task of ensuring a humane execution method. Moreover, the government initially scheduled these executions for December 2019 and January 2020, before the pandemic. Through no fault of the government's, that execution date was stayed until June 12, 2020. And once the stay was lifted, BOP promptly rescheduled the executions, consistent with the applicable regulation. *See* 28 U.S.C. § 26.3(a)(1).

Plaintiffs also argue (Mot. 20) that the government's interest in the timely enforcement of these death sentences is less than compelling because of the need to protect the health of federal inmates, BOP staff, visitors, and members of the public. As explained, however, the government has adopted extensive safety protocols, and in any event, nothing in RFRA permits a court to ignore a compelling government interest on the ground that other interests may be in play.

Combined with the implementation of its robust safety measures, the current execution schedule is the least restrictive means to accomplish the government's

16

compelling interest in carrying out these long-delayed sentences. RFRA's least-restrictive-means requirement does not compel the government to abandon "achieving its desired goal." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). Because the pandemic's duration—not to mention the timing of a vaccine or a cure—is unknown, plaintiffs' requested alternative would amount to an indefinite stay of execution—a result that would defeat the government's compelling interest in the timely enforcement of these capital sentences. *Cf. Ryan v. Gonzalez*, 568 U.S. 57, 76 (2013) (noting, in denying request for indefinite stay of execution, that absence of time limits could allow petitioners to "drag[]out indefinitely their federal habeas review"). Plaintiffs deny that their motion in effect requests an indefinite stay, but concede that "it is not exactly clear" when a COVID-19 vaccine or effective treatment will be developed. Mot. 21; the indefinite nature of the stay they request thus distinguishes this case from *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976).

In their court of appeals briefing, plaintiffs also belatedly assert an alternative argument that the government could hold the executions if they took certain additional protective measures. As the district court observed, however, the only relief the complaints request is postponement of the Purkey and Honken executions until a COVID-19 treatment or vaccine is widely available. *See* Dkt. 84, at 5.

## II. The Balance Of Equities Strongly Favors Staying Or Vacating The Preliminary Injunction.

Because plaintiffs failed to establish a likelihood of success on the merits, "the court must deny the injunction." *GEFT Outdoors,* 922 F.3d at 364.  Only after a plaintiff satisfies this threshold does a court proceed to "weigh the harm that the plaintiff will suffer absent and injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *Id.*

In this case, "wholly apart from the merits," the remaining stay factors also "strongly favor the government." *Execution Protocol Cases*, 955 F.3d at 126–27 (Katsas, J., concurring).  The mere "possibility" of viral exposure does not "demonstrate that irreparable injury is *likely* in the absence of an injunction," *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), especially given the virus-related precautions BOP has taken and offered plaintiffs.  And plaintiffs' assertion of harm is diminished by their own delay until July 2 (Hartkemeyer, Dkt. 6) and July 8 (O'Keefe, Dkt. 60)  to make the extraordinary request that these inmates' executions be halted "until treatment or a vaccine is available." Dkt. 1, at 29.

Moreover, whatever harms flow from plaintiffs' individual decisions regarding attendance, they do not outweigh the government's interest in carrying out scheduled executions after lengthy post-conviction review periods.  "A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. NRDC*, 555 U.S. 7, 24 (2008), and regardless of whether a plaintiff has shown a likelihood of success on the

merits of a statutory claim, the plaintiff still must show that the balance of equities supports the injunction. *See id.* at 23. Accordingly, *Winter* held that a violation of an environmental statute did not justify enjoining a military exercise where the public interest and the military interest in training sailors outweighed any irreparable harm to the plaintiffs. *See id.*; *cf. Execution Protocol Cases*, 955 F.3d at 129 (Katsas, J., concurring) (noting that federal courts "should not assist" attempts "to delay lawful executions indefinitely"). Indeed, this Court has recently rejected attempts to enjoin the execution of another inmate—Daniel Lewis Lee—by both potential witnesses and Lee himself, calling their claims "frivolous." *See Peterson*, 2020 WL 3955951 at *3; *Lee v. Watson*, No. 20-2128, slip op. 6 (7th Cir. July 10, 2020).

Indeed, even where an inmate himself directly challenges the method of execution, the Supreme Court has warned that courts must "police carefully against attempts to use such challenges as tools to interpose unjustified delay," *Bucklew*, 139 S. Ct. at 1134, which can even "undermine [capital punishment's] jurisprudential rationale by reducing its deterrent effect and retributive value," *id.* at 1144 (Breyer, J., dissenting) (alternation in original) (quotation marks omitted). Moreover, once post-conviction proceedings "have run their course," as they have here, "an assurance of real finality" is necessary for the government to "execute its moral judgment." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). As the Supreme Court recently noted in summarily vacating the District of Columbia District Court's preliminary injunction barring, on Eighth Amendment grounds, the execution of four capital sentences,

19

"'[l]ast minute stays' . . . 'should be the extreme exception, not the norm,'" given the courts' "responsibility 'to ensure that method-of-execution challenges to lawfully issued sentences are resolved fairly and expeditiously.'" *Barr v. Lee*, No. 20A8, Slip Op. at 3 (S. Ct. Jul. 14, 2020). If that is true for an Eighth Amendment claim by the inmate himself, it is true a fortiori for a RFRA claim by the inmate's minister.

Finally, the government's interest in implementing these sentences is "magnified by the heinous nature" of these inmates' offenses, which include raping, murdering, and dismembering children. *See Execution Protocol Cases*, 955 F.3d at 127 (Katsas, J., concurring) (discussing these inmates' crimes); *see also Barr v. Roane*, 140 S. Ct. 353 (Mem) (2019) (statement of Alito, J.) (noting these inmates' "exceptionally heinous murders"). Plaintiffs' interest in ministering to the condemned and witnessing the executions that will redress these terrible crimes cannot outweigh the government's interest in actually conducting them.

## CONCLUSION

This Court should deny plaintiffs' motion for an injunction barring these executions pending appeal.

Respectfully submitted,

DAVID M. MORRELL*
*Deputy Assistant Attorney General*

JOSH J. MINKLER
*United States Attorney*

20

SOPAN JOSHI
  *Senior Counsel to the Assistant*
  *Attorney General*

PAUL R. PERKINS
  *Special Counsel*

MICHAEL S. RAAB
MELISSA N. PATTERSON
*s/s Lowell V. Sturgill Jr.*
LOWELL V. STURGILL JR.
AMANDA L. MUNDELL
ASHLEY A. CHEUNG
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7241*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3427*
  *Lowell.Sturgill@USDOJ.Gov*

*The Acting Assistant Attorney General is recused in this case.

July 2020

21

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion satisfies the type-volume limitation in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5177 words.  This motion also complies with the typeface and type-style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Lowell V. Sturgill Jr.*
LOWELL V. STURGILL JR.

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.  Parties to the case are represented by a registered CM/ECF user, and service will be accomplished by the appellate CM/ECF system.

*/s/ Lowell V. Sturgill Jr.*
LOWELL V. STURGILL JR.